THOMAS E. SNYDER SONS CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 70269. Filed June 6, 1960.

*John E. Hughes, Esq., John W. Hughes, Esq.,* and *Harold R. Burnstein, Esq.,* for the petitioner.

*David H. Nelson, Esq.,* for the respondent.

TIETJENS, *Judge:* The Commissioner determined the following deficiencies in income tax:

| Fiscal year ended Feb. 28— | Amount |
| --- | --- |
| 1954 | $4,128.56 |
| 1955 | 50,870.97 |
| 1956 | 49,875.03 |

The only question for decision is whether petitioner is entitled to carry over net operating losses incurred in its former farm implement business in prior years against its subsequent earnings from a different type of business not owned at the time of the losses.

### FINDINGS OF FACT.

The stipulated facts are so found and the stipulation together with the exhibits attached thereto are included herein by reference.

Petitioner is an Illinois corporation organized on March 3, 1949, as "Great American Farm Implement Corp." Its income tax returns were filed with the district director of internal revenue at Chicago, Illinois.

Petitioner's articles of incorporation provided for the following corporate purposes:

1. To make, manufacture, design, own and sell, and otherwise use, deal in, and dispose of all kinds and types of machinery, parts, and products.

2. To buy, own, hold, sell, assign, and otherwise deal in and dispose of patents and patent applications, and grant licenses thereof and collect royalties for licenses granted and the consideration for patents and patent applications sold or assigned.

3. To acquire, own, use, convey and otherwise dispose of and deal in real property or any interest therein.

4. To act as agent in the sale of machinery, parts and products, and to service the same.

It was organized to develop and market cornpickers and other agricultural machinery.

At its incorporation Benjamin A. Snyder owned 625 shares of petitioner out of a total of 1,795 shares issued. Benjamin acquired his shares for $62,500.

Petitioner reported net losses on its Federal income tax returns as follows:

| Fiscal year ended Feb. 28— | Net loss |
|---|---|
| 1950 | $48,267.66 |
| 1951 | 120,452.66 |
| 1952 | 40,344.50 |
| 1953 | 30,610.06 |

By February 28, 1953, petitioner was out of the business of developing, manufacturing, and selling cornpickers.

In order to gain 100 per cent control Benjamin acquired the rest of petitioner's stock for a nominal price in 1953.

As of August 1, 1953, petitioner had outstanding debts represented by notes payable in the aggregate amount of $82,224.37. On August 25, 1953, Benjamin and his brother Warren Snyder acquired these notes at a purchase price of $3,091.

Benjamin graduated from college in 1939 and shortly thereafter decided to go into the business of transporting molasses in tank cars and merchandising the molasses, using his deceased father's name. The business was incorporated under the name of Thomas E. Snyder Sons Co. in 1941 and is hereafter sometimes referred to as "Old Snyder" to distinguish it from petitioner. Benjamin was the president and sole stockholder of Old Snyder. It engaged in the business of buying and selling molasses during its corporate life.

Between 1949 and 1953, Benjamin purchased in his own name 45 railroad tank cars which he operated as a sole proprietor and which were used principally to transport molasses dealt in by Old Snyder. He was paid for the use of these cars on a mileage basis by the railroads over which they traveled. These cars were acquired as follows:

| Date | Number of cars |
|---|---|
| Aug. 31, 1949 | 14 |
| Jan. 28, 1952 | 2 |
| May 12, 1952 | 19 |
| Aug. 17, 1953 | 10 |
| | 45 |

When the business was incorporated in 1941, Old Snyder owned tank cars in conjunction with its molasses business, but during the war these were sold off. During Benjamin's absence with the Armed Forces in World War II, the business ran down and his purchase of the tank cars (in 1949 and later years) was part of his program of rebuilding it.

The following table is a condensed statement of the earnings which Benjamin derived from his tank car operations for the calendar years 1949 through 1952 and for the period in 1953 ending August 31:

| | 1949 | 1950 | 1951 | 1952 | Jan. 1–Aug. 31, 1953 |
|---|---|---|---|---|---|
| Mileage earned | $1,676.01 | $12,054.24 | $14,448.46 | $22,407.43 | $42,488.45 |
| Depreciation | 1,984.71 | 6,804.76 | 6,464.53 | 14,191.79 | 11,807.09 |
| Repairs | 567.06 | 415.38 | 1,250.35 | 2,769.24 | 1,169.88 |
| Other | | 1,501.76 | 53.21 | | |
| | 2,551.77 | 8,721.90 | 7,768.09 | 16,961.03 | 12,976.97 |
| Net profit (or loss) | (875.76) | 3,332.34 | 6,680.37 | 5,446.40 | 29,511.48 |

On September 1, 1953, immediately after acquiring petitioner's stock and notes as hereinbefore stated, Benjamin transferred his 45 tank cars to petitioner in exchange for a note, secured by a chattel mortgage, in the amount of $247,258.57, bearing interest at 4 per cent per annum, payable monthly. The amount of the note was equal to Benjamin's adjusted basis in the tank cars. In November 1953 petitioner acquired 10 more tank cars at a cost of $72,617.60. Petitioner's balance sheet on August 31, 1953 (immediately before its acquisition of Benjamin's tank cars), showed a deficit in earned surplus of $242,411.30.

On September 2, 1953, the purpose clause of petitioner's articles of incorporation (Article Four) was amended to read as follows:

### Article Four

The purpose or purposes for which the corporation is organized are:

1. To make, manufacture, design, own and sell, rent, and otherwise use, deal in, and dispose of all kinds and types of machinery, tank cars, parts, products, and produce including molasses.

2. To buy, own, hold, sell, assign and otherwise deal in and dispose of patent applications and grant licenses thereof and collect royalties for licenses

granted and the consideration for patents and patent applications sold or assigned.

3. To acquire, own, use, convey or otherwise dispose of and deal in real property or any interest therein.

From September 1, 1953, to the close of its fiscal year ended February 28, 1954, petitioner's sole income was from the railroad's payments on account of tank car mileage. On audit this was determined to be $39,339.92 (gross) although on its income tax return, it was originally reported to have been $47,669.55. On its return for the fiscal year ended February 28, 1954, petitioner reported net income before net operating loss deduction of $19,693.34 against which it claimed a net operating loss deduction of $214,075.55, thus reporting no income subject to tax. The net operating loss deduction resulted from a carryover of losses from the prior years.

Effective March 1, 1954, petitioner and Old Snyder agreed to merge under Illinois law. Under the agreement Old Snyder was to merge into petitioner and petitioner was to change its name to that of Old Snyder, i.e., "Thomas E. Snyder Sons Co." The reorganization was duly effected on March 25, 1954.

The taxable net income of Old Snyder for each of its fiscal years ended August 31, 1950 through 1953, and for the premerger period September 1, 1953, through February 28, 1954, as shown on its Federal income tax returns was as follows:

| Fiscal year ended Aug. 31— | Net income |
|---|---|
| 1950 | $43,989.75 |
| 1951 | 44,857.74 |
| 1952 | 20,467.47 |
| 1953 | 23,405.42 |
| Period 9/1/53–2/28/54 | 7,434.41 |

Petitioner's normal and surtax net income before net operating loss deductions for each of the years involved in this proceeding was as follows:

| Fiscal year ended Feb. 28— | Amount |
|---|---|
| 1954 | $13,761.85 |
| 1955 | 108,449.71 |
| 1956 | 114,625.96 |

Petitioner's income during the fiscal year ended in 1954 was derived from rental of tank cars and for fiscal years ended in 1955 and 1956 from the rental of tank cars and buying and selling molasses. The tank cars had been purchased from Benjamin as described above and the business of buying and selling molasses was acquired by the merger of Old Snyder into petitioner also described above.

In the statutory notice, respondent disallowed petitioner's net operating loss deductions in each of the fiscal years ended February 28 (29), 1954 through 1956. His explanation for 1954 was:

The net operating loss deduction of $19,693.34 claimed as arising from a net operating loss carry-over of Great American Farm Implement Corp. in the alleged amount of $214,075.55 is not allowable under the provisions of sections 23(s), 45, 122, 129 or any other section of the Internal Revenue Code of 1939.

Except for dollar amounts and references to sections 172, 269, and 482 of the Internal Revenue Code of 1954, the explanation for the 1955 and 1956 fiscal years is practically identical to the one above.

The business of petitioner which incurred the losses in question was entirely different from its business which produced the income against which it now seeks to offset these losses by means of the net operating loss deduction.

Benjamin A. Snyder, an individual, acquired ownership of stock of petitioner after October 8, 1940, and thus became possessed of at least 50 per cent of the total combined voting power of all classes of stock entitled to vote or at least 50 per cent of the total value of shares of all classes of stock of the petitioner corporation.

Benjamin acquired control of petitioner in 1953.

The principal purpose of Benjamin for acquiring control of petitioner was to evade or avoid Federal income tax by securing to himself, as sole shareholder, the benefit of petitioner's net operating loss deductions, a benefit or deduction which he would not otherwise have enjoyed.

OPINION.

The Commissioner makes the same arguments here, in essence, that he made in *British Motor Car Distributors, Ltd.*, 31 T.C. 437, revd. 278 F. 2d 392 (C.A. 9). Those arguments are:

1. The net operating losses are not allowable under correlative Sections 23(s) and 122 of the Internal Revenue Code of 1939 because the *business* which incurred the losses was entirely different from the *business* which produced the profits against which the losses are sought to be offset. It matters not that the same corporate shell is availed of for the conduct of both the loss and the profit enterprises.

2. The net operating loss deduction must be disallowed under the 1939 Code, Section 129 [1] because its sole shareholder acquired control of petitioner for the principal purpose of avoiding Federal income tax by securing the *benefit* of a

---

1 SEC. 129. ACQUISITIONS MADE TO EVADE OR AVOID INCOME OR EXCESS PROFITS TAX.

(a) DISALLOWANCE OF DEDUCTION, CREDIT, OR ALLOWANCE.—If (1) any person or persons acquire, on or after October 8, 1940, directly or indirectly, control of a corporation, * * * and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income or excess profits tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. * * * [So far as here applicable, section 269, I.R.C. 1954, contains no substantial change.]

net operating loss deduction, a benefit which he would not otherwise have enjoyed but for acquiring that control. So long as the *enjoyment* of the benefit is in the acquiring person, it does not matter whether the actual deduction which produces the benefit is claimed by the acqui*ring* person or the acqui*red* corporation.

Petitioner's contentions are (1) that section 129, I.R.C. 1939, and the correlative section of the 1954 Code are not applicable because the acquisition of control of petitioner by Benjamin was not made for the principal purpose of evasion or avoidance of Federal income tax and neither petitioner nor its stockholders acquired a deduction which it or he would not otherwise enjoy, citing *British Motor Car Distributors, Ltd.*, *supra*, and (2) that *Libson Shops, Inc.* v. *Koehler*, 353 U.S. 382, does not apply because the surviving corporation is carrying over its own operating loss, again citing *British Motor Car* and the cases cited therein.

Aside from the question of motive, the basic facts here are similar to those in *British Motor Car*. In 1953 petitioner was little more than a corporate shell with incurred losses. By that time it was out of the cornpicker business which it had theretofore carried on. Benjamin acquired control in 1953 by the purchase of additional shares of petitioner and thereafter transferred to it the tank cars he had been operating at a profit. He also merged into petitioner a corporation wholly owned by him which was conducting a profitable molasses business. Petitioner now seeks to carry over the losses of its abandoned business and set them off against the income from its new business.

The only possible distinction between this case and *British Motor Car* is that in *British Motor Car* the petitioner made no claim of business purpose for the acquisition of control. Here petitioner does make that claim. But the claim is based primarily upon Benjamin's own testimony and we think it is without substance. He testified that he had never been connected with a losing venture; that he wished to consolidate his tank car and molasses ventures because the competitive picture called for it, and that he wanted petitioner to have the advantage of the molasses business income. The only one of these reasons that sounds plausible is that Benjamin wanted petitioner to stop losing money. But is this the kind of reason that automatically takes on the color of a "business purpose"? We would suppose that the desire to make profit could be said to be inherent in the great majority of business transactions, but certainly all such transactions do not carry with them the substantial "business purpose" necessary to give them life for tax purposes. Here Benjamin already had a going tank car business under his sole proprietorship and a wholly owned corporation carrying on the molasses business. If competition required him to consolidate the two, it was just as

easily done by putting his tank cars into Old Snyder as by putting both the cars and Old Snyder's molasses business into petitioner. Why, businesswise, go to the trouble of resuscitating the gasping petitioner? We think the basic facts speak more loudly and more persuasively than Benjamin's oral testimony. Petitioner was a so-called "loss" corporation. Its business had been practically abandoned and it had losses. The only way those losses could be made use of taxwise, was to follow the steps which Benjamin herein pursued, provided, of course, that this Court adhered to its reasoning in the *British Motor Car* case and cases cited therein. We have found that the principal purpose for Benjamin's acquisition of control of petitioner was to secure the benefit of a net operating loss deduction which he would not otherwise enjoy except by becoming controlling stockholder of petitioner. This being so, both section 129, I.R.C. 1939, and section 269, I.R.C. 1954, require the disallowance of the operating loss carryover.

We recognize that this runs counter to our holding in *British Motor Car Distributors, Ltd., supra,* and possibly to the cases relied on therein. However, we have carefully reconsidered our opinion therein in the light of its reversal by the Court of Appeals for the Ninth Circuit, *Commissioner* v. *British Motor Car Distributors, Ltd., supra,* and also the reasoning of the United States Courts of Appeals for the Fourth and Fifth Circuits in *Coastal Oil Storage Co.* v. *Commissioner,* 242 F. 2d 396, reversing 25 T.C. 1304, and *Mill Ridge Coal Company* v. *Patterson,* 264 F. 2d 713, certiorari denied 361 U.S. 816, affirming United States District Court. We had held that section 129, I.R.C. 1939, applied only where the person acquiring control of a corporation was the taxpayer seeking the benefit of a loss carryover and that the section did not apply where the taxpayer was the corporation whose control was acquired. In this we are now convinced we were in error and we will no longer follow *British Motor Car Distributors, Ltd., supra,* and the cases cited therein on this point.

In so saying we are not unmindful of the recent case of *Virginia Metal Products, Inc.,* 33 T.C. 788 where language approving the opinion of this Court in *British Motor Car* appears. It is not necessary here to disapprove *Virginia Metal Products, Inc.,* because there it was specifically found that "acquisition by Virginia * * * was made for a bona fide business purpose, and not principally for the interdicted purpose mentioned in section 129 of the Internal Revenue Code of 1939." We have here made a contrary finding.

No useful purpose would be served in setting forth *in extenso* here the reasoning of the Ninth Circuit in its reversing opinion in *Commissioner* v. *British Motor Car Distributors, Ltd., supra.* It is suffi-

cient to say that we now agree with that reasoning. Neither is it necessary to discuss the applicability of *Libson Shops, Inc.* v. *Koehler, supra,* for, on the facts as we have found them, section 129 of the Internal Revenue Code of 1939 and section 269 of the Internal Revenue Code of 1954 are applicable and the petitioner's claim for a deduction for net operating loss carryovers is denied.

Other questions have been disposed of by stipulation.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

Drennen, *J.,* concurs in the result.