TEMPLE SQUARE MFG. CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 82854. Filed April 12, 1961.

*William T. Walker, Esq.*, for the petitioner.
*Bart A. Brown, Jr., Esq.*, for the respondent.

MULRONEY, *Judge:* The respondent determined deficiencies in the petitioner's income tax for the fiscal years ended April 30, 1954, 1955, and 1956, in the amounts of $8,120.17, $14,868.79, and $4,815.42, respectively. The issue is whether the petitioner is entitled to deduct certain losses in the total amount of $74,102.06 incurred in its discontinued auto sales business from its income in the operation of a new business in the fiscal years 1954, 1955, and 1956.

### FINDINGS OF FACT.

Some of the facts were stipulated and they are incorporated herein by this reference.

Temple Square Mfg. Co., hereinafter sometimes called petitioner, is a corporation organized under the laws of the State of Ohio. Petitioner's principal place of business was Akron, Ohio, and it filed its corporate income tax returns for the fiscal years 1954, 1955, and 1956 with the district director of internal revenue at Cleveland, Ohio.[1]

Temple Square Motors, Inc., hereinafter sometimes called Temple Square, was incorporated under the laws of the State of Ohio on May 1, 1951, and it acquired a franchise from the Kaiser-Fraser Company and engaged in business as an automobile agency for the sale of new Kaiser-Fraser automobiles, the sale of used automobiles, and the operation of a garage for the repair of automobiles. On or about May 1, 1951, 200 shares of common stock of Temple Square were issued at $100 per share as follows: L. Ray Sarver, 100 shares, and John H. Haller, 100 shares. From April 30, 1953, to on or about September 1, 1953, the issued and outstanding common stock of Temple Square consisted of 400 shares and it was held as follows: L. Ray Sarver, 240 shares, and I. D. Lowe, 160 shares.

Temple Square sustained net operating losses for its taxable years ending April 30, 1952, and April 30, 1953, in the amounts of $11,364.79 and $34,936.34, respectively. On May 11, 1953, Temple Square gave up its Kaiser-Fraser franchise and thereafter its automobile business consisted of disposing of inventory, equipment, accessories, parts, and supplies, and settling the obligations of such business.

At various times through August 31, 1953, Sarver and Lowe made loans to Temple Square totaling $34,546.98, which amount was re-

---

[1] The return for the fiscal year 1954 is stamped "RECEIVED JUNE 11 1954 DIRECTOR INT. REV. AKRON."

paid by Temple Square in full between September 30, 1953, and January 3, 1955.

Prior to December 22, 1949, John E. Lydle operated a proprietorship engaged in manufacturing, distributing, and selling fireplace screens and allied products. On December 22, 1949, Thermo-Rite Manufacturing Co., hereinafter called Thermo-Rite, was incorporated under the laws of the State of Ohio, and on or about December 24, 1949, John E. Lydle transferred the proprietorship business to Thermo-Rite in exchange for 5 shares of its common stock, which were the only shares of stock ever issued by Thermo-Rite. Thermo-Rite had net profits for its taxable years ended September 30, 1951 and 1952, and for its taxable year ended August 31, 1953, in the amounts of $23,954.82, $26,750, and $17,610, respectively.

Sarver and Lowe were at all times material herein partners in a certified public accounting firm doing business in Akron, Ohio. Since about 1940 Sarver had been the accountant for Lydle, performing personal and business accounting services, including tax matters, for Lydle.

In June 1953 Sarver and Lowe began negotiations with John E. Lydle for the purchase of his stock in Thermo-Rite. On August 26 Sarver wrote a memorandum to Lowe concerning these negotiations as follows:

> Pursuant to our letter of June 4, 1953, Mr. Lydle talked to me today about the sale to us of his Thermo-Rite capital stock, in line with my figure of August 24th.
>
> > He is willing to sell
> > Wants a price of $120,000.00
> > He will continue as manager for a salary of $600. monthly.
>
> Lowe, would Temple Mfg. Co. be a good investment for the Trusts which you. represent as trustee? Would you approve a purchase of Temple Mfg. Co.'s stock for $120,000?
>
> If you agree; I am in favor of this deal as it will enable us to realize something from our advances to Temple Co. and with the Net Loss Carryover the Temple Co. will benefit greatly.
>
> Mr. Lydle will accept payment any time not later than September 30, 1953.

On or about August 28, 1953, Lydle sold 3 of his Thermo-Rite shares to Sarver for $72,000, and the remaining 2 shares of Thermo-Rite stock to Lowe for $48,000, for a total consideration of $120,000. On August 28, 1953, Sarver and Lowe, as the board of directors of Thermo-Rite, adopted a resolution to dissolve the corporation, and on August 31, 1953, the assets of Thermo-Rite, subject to its liabilities, were distributed to its sole stockholders, Sarver and Lowe, as follows: Sarver, an undivided three-fifths interest, and Lowe, an undivided two-fifths interest.

The assets, liabilities, and net worth of Thermo-Rite as of August 31, 1953, were as follows:

ASSETS

| | |
|---|---|
| Cash | $7,766.13 |
| Notes and accounts receivable (less res.) | 41,532.99 |
| Inventory | 21,990.99 |
| Fixed assets (less res.) | 4,405.21 |
| Miscellaneous | 141.66 |
| Total assets | $75,836.98 |

LIABILITIES AND NET WORTH

| | | |
|---|---|---|
| Accounts payable | $12,975.14 | |
| Accrued income taxes 1953 | 5,283.23 | |
| Miscellaneous | 765.17 | |
| | | 19,023.54 |
| Capital stock | 500.00 | |
| Surplus | 56,314.44 | |
| | | 56,813.44 |
| Total liabilities and net worth | | 75,836.98 |

On September 1, 1953, Sarver and Lowe transferred to Temple Square as a contribution to capital all of the properties distributed to them by Thermo-Rite, and beginning on that date Temple Square engaged in the business of manufacturing, distributing, and selling fireplace screens and allied products. During the fiscal years ending April 30, 1954, 1955, and 1956, all billings as to the fireplace screen manufacturing and sales business were made in the name of Thermo-Rite Manufacturing Company, the bank account was in the name "Temple Square Mfg. Co. d/b/a Thermo-Rite Mfg. Co." and the letterhead on all stationery read "The Thermo-Rite Mfg. Co." After Sarver and Lowe purchased the Thermo-Rite stock, John E. Lydle remained as principal officer and manager of the fireplace screen manufacturing and sales business.

About the middle of September 1953, L. Ray Sarver sold his 240 shares and I. D. Lowe sold his 160 shares of Temple Square stock equally to the Barbara J. Lydle Trust, the Marilyn K. Lydle Trust, and the Richard C. Lydle Trust for a total consideration of $120,000. Payment was made by checks dated September 16, 1953, and September 21, 1953. Each of these trusts had been created on February 1, 1949, by Kathryn Lydle, wife of John E. Lydle. I. D. Lowe was named trustee for each of the trusts, and he has served as trustee from 1949 throughout the years here involved.

By checks dated September 25, 1953, Sarver and Lowe paid John E. Lydle $120,000 for his stock in Thermo-Rite.

At a meeting of the shareholders of Temple Square Motors, Inc., held on September 30, 1953, the shareholders elected to change the name of the corporation to Temple Square Mfg. Co., petitioner herein.

For the taxable year ended April 30, 1954, the fireplace screen business operated under the name of Temple Square Motors, Inc., and Temple Square Mfg. Co. had a net profit of $25,670.87, and the automobile business operated under the name of Temple Square Motors, Inc., and Temple Square Mfg. Co. had a net loss of $27,800.93.

In its corporate income tax return for the taxable year ended April 30, 1954, the petitioner reported a net loss of $48,431.19. A summary of the computation is as follows:

| | | |
|---|---|---|
| Net profit—Fireplace screen business (9/1/53–4/30/54) | | $25,670.87 |
| Less: Net loss—automobile business (T/y ended 4/30/54) | | (27,800.93) |
| | | (2,130.06) |
| Less: Net operating loss deduction: | | |
| Net loss for taxable year ended 4/30/52 | ($11,364.79) | |
| Net loss for taxable year ended 4/30/53 | (34,936.34) | (46,301.13) |
| Net loss reported | | (48,431.19) |

In its corporate income tax return for the taxable year ended April 30, 1955, petitioner showed "Taxable income before net operating loss deduction" in the amount of $39,170.75, and from this amount deducted the carryover net operating loss deduction of $48,431.19 to show a reported loss of $9,260.44 for the taxable year. Petitioner carried this amount over to its return for the taxable year ended April 30, 1956, in which year its return showed a "Taxable income before net operating loss deduction" of $44,231.45, and a net operating loss deduction of $9,260.44.

Respondent disallowed deductions claimed by petitioner in the taxable year ended April 30, 1954, in the amount of $74,102.06 ($27,800.93 plus $46,301.13) with the explanation that such losses were "not deductible by you under section 23 of the Internal Revenue Code of 1939 because of the provisions of sections 122 and/or 129 of the Internal Revenue Code of 1939." Respondent also disallowed the net operating loss deductions of $48,431.13 and $9,260.44 claimed by petitioner in the taxable years ended April 30, 1955 and 1956, with the explanation that the losses were "not deductible by you under section 161 of the Internal Revenue Code of 1954 because of the provisions of sections 172 and/or 269 of the Internal Revenue Code of 1954."

### OPINION.

Respondent's determination that the principal purpose for the acquisition of petitioner's stock was to secure a tax benefit not otherwise enjoyable is presumptively correct, and it is petitioner's burden to prove that such determination was erroneous. *American Pipe & Steel Corporation*, 25 T.C. 351, affd. 243 F. 2d 125, certiorari denied 355 U.S. 906.

Section 129 of the Internal Revenue Code of 1939, which is substantially the same as section 269 of the Internal Revenue Code of 1954, provides that "If (1) any person or persons acquire, on or after October 8, 1940, directly or indirectly, control of a corporation * * * and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income or excess profits tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. * * *" In *Urban Redevelopment Corporation*, 34 T.C. 845; *Thomas E. Snyder Sons Co.*, 34 T.C. 400, affd. 288 F. 2d 36; and *Army Times Sales Co.*, 35 T.C. 688, we held that if the principal purpose for the acquisition is the avoidance of tax, then these sections apply, and it does not matter whether the actual deduction which produces the benefit is claimed by the acquiring person or the acquired corporation.

The only difference between this case and the cited cases is that here the loss corporation acquired the profitable business before the trust acquired petitioner's stock. The difference is a factual immateriality. It was still a scheme, carried out by several integrated steps for the principal purpose of securing the benefit of deductions from the losses of the abandoned automobile business.

As we have outlined in our Findings of Fact, a profitable fireplace screen manufacturing and sales business operated by Lydle in corporate form was transferred to petitioner, a loss corporation, and the petitioner's stock was then almost immediately acquired by the three trusts (created in 1949 by Lydle's wife) for the Lydle children.[2] The previous losses of petitioner amounting to $74,102.06 from its discontinued automobile agency business were used by petitioner as deductions. The acquiring persons (the trusts) thus received indirectly the benefit of deductions (claimed by the petitioner) which they would not otherwise have enjoyed.

In view of the close association of the parties it is clear that the transactions here involved were not at arm's length. Sarver had handled personal and business accounting services, including tax matters, for some 20 years. Lowe, who was Sarver's partner in a certified public accounting firm, was trustee of the three Lydle trusts since 1949. It is obvious that Sarver and Lowe did not intend to buy the stock in Thermo-Rite for themselves. This is amply borne out by the evidence. Lowe's testimony that "we wanted time to raise the $120,000" indicates they were in no position to purchase the Thermo-Rite stock.[3] The memorandum of June 4, 1953, shows that even be-

[2] Both section 3797(a)(1) of the Internal Revenue Code of 1939 and section 7701(a)(1) of the Internal Revenue Code of 1954 define "person" as including a trust.

[3] It is also significant that Sarver and Lowe made the $120,000 payment to Lydle for his Thermo-Rite stock on September 25, 1953, *after* they had received $120,000 from the trusts.

fore they bought the Thermo-Rite stock they were planning to transfer their loss corporation to the trusts. The timing is also revealing. On or about August 28, 1953, Lydle sold his Thermo-Rite stock to Sarver and Lowe; about a week later Sarver and Lowe dissolved Thermo-Rite and contributed its properties to petitioner; within 2 or 3 weeks Sarver and Lowe sold their stock in petitioner to the trusts.

Petitioner contends that the principal purpose of the trusts in acquiring petitioner was to acquire a solvent and going business that had every prospect of making large profits. To support this argument we have only the bare statement of Lowe, the trustee for the Lydle trusts, who testified that the principal purpose for the acquisition by the trusts was "To secure a profitable business for them to invest their money in." The only part of petitioner's business that was profitable was the fireplace screen business. If the trust sought a profitable business, there is no apparent reason why it did not purchase the shares of Thermo-Rite directly from Lydle. There was no business reason for keeping the petitioner alive after it had abandoned its unprofitable automobile agency and using it as a vehicle for the transfer of the profitable fireplace screen business. The only reason apparent in this record for casting the transaction in this form was to receive the benefits of petitioner's sizable losses which otherwise would not be enjoyed by the trusts. The fact that even after petitioner acquired the fireplace screen business, such business continued to be operated without interruption in the name of Thermo-Rite Manufacturing Company, with John E. Lydle remaining as principal officer and manager of the business, also indicates that the acquisition of petitioner's corporate shell was not for business reasons.

When the trusts purchased petitioner's stock, the necessary combination of the loss venture with the profitable venture had already taken place under a step of the integrated prearranged scheme. Under the facts of this case we do not regard as significant the particular sequence in which the several steps took place. The language of the statute is broad. It reaches any acquisition of a loss corporation directly or indirectly where the principal purpose is "evasion or avoidance of Federal income or excess profits tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy." The legislative history of section 129 of the Internal Revenue Code of 1939 indicates that the acquisitions could take many forms, and, therefore "the section has not confined itself to a description of any particular methods for carrying out such tax avoidance schemes but has included within its scope these devices in whatever form they may appear." H. Rept. No. 871, 78th Cong., 1st Sess., 1944 C.B. 901, 938.

Petitioner argues that the *Snyder* case, and the *Urban Redevelopment Corporation* case, as well as the other cases dealing with section

129 of the Internal Revenue Code of 1939, "involve loss carryovers and do not necessarily extend to cases where deductions have been taken as such during a single year." If we understand petitioner's contention correctly, the petitioner has reference to the petitioner's taxable year ended April 30, 1954, the year in which the Thermo-Rite fireplace screen business was absorbed by petitioner. In that taxable year, the petitioner had a net loss of $27,800.93 from its automobile business, which it deducted from the net profit of $25,670.87 of its fireplace screen business over the period from about September 1, 1953, to April 30, 1954. There is no merit to petitioner's contention. *Elko Realty Co.*, 29 T.C. 1012, affd. 260 F. 2d 949. The sections applicable here broadly disallow a deduction, credit, or allowance where the principal purpose of the acquisition is to obtain the benefit of a deduction, credit, or allowance which would not otherwise be enjoyed, but for the acquisition.

Nothing in the language of the statutes indicates their application is to be confined to losses sustained by the loss corporation in the years before acquisition. Once the principal purpose of the acquisition is found, namely, to evade or avoid tax, any deduction which would not otherwise be available, is rendered unallowable. Again the legislative history is revealing.[4] It shows Congress was legislating against securing any benefit of any deduction and nothing therein indicates any intention to limit the deductions for losses sustained in the years before acquisition. To accept petitioner's contention would thwart the clearly expressed purpose of the statutes.

On the basis of this record the petitioner has not established that the principal purpose for the acquisition by the trusts of petitioner's stock was other than to obtain the benefit of its net operating losses.

---

[4] "This section is designed to put an end promptly to any market for, or dealings in, interests in corporations or property which have as their objective the reduction through artifice of the income or excess profits tax liability.

"The crux of the devices which have come to the attention of your committee has been some form of acquisition on or after the effective date of the Second Revenue Act of 1940, but the devices take many forms. Thus, the acquisition may be an acquisition of the shares of a corporation, or it may be an acquisition which follows by operation of law in the case of a corporation resulting from a statutory merger or consolidation. The person, or persons, making the acquisition likewise vary, as do the forms or methods of utilization under which tax avoidance is sought. Likewise, the tax benefits sought may be one or more of several deductions or credits, including the utilization of excess profits credits, carry-overs and carry-backs of losses or unused excess profits credits, and anticipated expense of other deductions. In the light of these considerations, the section has not confined itself to a description of any particular methods for carrying out such tax avoidance schemes but has included within its scope these devices in whatever form they may appear. For similar reasons, the scope of the terms used in the section is to be found in the objective of the section, namely, to prevent the tax liability from being reduced through the distortion or perversion effected through tax avoidance devices. The term 'Federal income or excess profits tax' refers to any Federal tax imposed by Congress upon an income base. The term 'deduction, credit or allowance' has reference to any provision which has the effect of diminishing the tax liability resulting from the gross amount of any item of income or the aggregate of the gross amounts of any or all items thereof. [H. Rept. No. 871, 78th Cong., 1st Sess., 1944 C.B. 901, 938.]"

We hold that both section 129 of the Internal Revenue Code of 1939 and section 269 of the Internal Revenue Code of 1954 require the disallowance of the deductions claimed by petitioner in its taxable years ended April 30, 1954, 1955, and 1956.

*Decision will be entered for the respondent.*