James R. Lockwood and Joyce M. Lockwood v. Commissioner.
Lockwood v. Commissioner
Docket No. 3732-66.
United States Tax Court
T.C. Memo 1968-274; 1968 Tax Ct. Memo LEXIS 26; 27 T.C.M. (CCH) 1462; T.C.M. (RIA) 68274; November 27, 1968, Filed *26 Gross income: Termination pay: Discharge of indebtedness: Club membership: Automobile: Taxable year of inclusion: Right to automobile. - The court found that a former corporate officer was indebted to the corporation and that he realized severance payments on the forgiveness of the indebtedness. also, the taxpayer realized income to the extent of a club membership when it was agreed that he could retain it as his own property after the termination of his employment. In addition, the taxpayer realized income to the 1463 Leonard B. Hankins for the petitioners. Morley H. White and Brice Tondre, for respondent. TANNENWALD
Memorandum Findings of Fact and Opinion TANNENWALD, Judge: For the taxable year ending December 31, 1961, respondent determined deficiencies in petitioners' income taxes as follows: Petitioner
Income tax
Addition to taxunder [1] Sec. 6653(a)
James R. Lockwood
$5,859.13
$292.96
Joyce M. Lockwood
5,931.13
296.56
*27 We must decide whether petitioner James Lockwood received as severance pay in 1961: $15,000 in the form of discharge of his indebtedness to his employer; $2,400 in the form of membership in a country club and; $3,500 in the form of a 1960 Ford Thunderbird automobile. In addition we must decide whether each petitioner was negligent in failing to report those items that should have been reported. Findings of Fact General Petitioners, James R. Lockwood and his wife, Joyce M. Lockwood, filed separate Federal income tax returns for calendar year 1961 with the district director of internal revenue, Los Angeles, California. At the time the petition herein was filed, petitioners resided in Corona Del Mar, California. The tax liability of Joyce Lockwood is before us only because of California's community property law. To avoid confusion, we shall hereinafter refer to petitioner James Lockwood as "Lockwood." From 1953 until 1961, Lockwood was employed by the Pioneer Manufacturing Co. as Vice President in Charge of Sales. During at least part of this period, he was simultaneously employed *28 by Pioneer Distributing Co. Both corporations were members of a group of corporations closely held and controlled by the Polverini family. At least from August 1, 1958 to March 31, 1961, Lockwood was nominally a director of Pioneer Manufacturing. Commencing at least as early as 1959, Lockwood was paid salary at the rate of $25,000 annually. In addition, he received bonuses from Pioneer Manufacturing of $12,000 in 1957, $10,000 in 1959, and $20,832.67 in 1960. Pioneer Manufacturing operated at a substantial loss in 1958 and no bonuses were declared for any employees. Discharge of Indebtedness In 1955, 1956, and 1957, Lockwood bought stock in Pioneer Manufacturing. His total acquisitions constituted a 10 percent interest and cost him approximately $24,000. He sold his entire interest to the Polverinis in 1959 for an amount equal to his cost. In June 1956, Lockwood bought stock in Pioneer Range Co., one of the Polverini group of corporations, for $2,250. This stock was repurchased by Pioneer Range sometime in 1959 at an unknown price. On his 1959 Federal income tax return, Lockwood reported the proceeds of the sale of the stock of Pioneer Manufacturing as equal to his cost, resulting *29 in neither gain nor loss; he did not report the Pioneer Range sale. On December 15, 1958, Pioneer Manufacturing Co. entered into a written agreement (hereinafter referred to as the employee's trust agreement) with Lockwood. The company promised to pay him or the beneficiaries he designated $500 a month for a maximum period of 16 years and 8 months from the time he died or 1464 retired. The payments would be made only if he continued to work for the company until death or complete retirement. The agreement recited that the company had purchased a life insurance policy with which to fund the payments and further recited that neither Lockwood nor his beneficiaries were to have any rights under, or interest in, the policy itself. Pioneer Manufacturing kept a ledger account labeled "Advances to Employees" (hereinafter referred to as Account 115). With the exception of very minor unexplained adjustments, Account 115 was consistent with other accounts of Pioneer Manufacturing. Account 115 represented advances to employees and repayments by them. Some of the advances took the form of purchase of goods for the employees rather than actual cash. The payroll accounts of Pioneer Manufacturing *30 show that some repayments were withheld from the salaries of employees (including Lockwood as well as other employees) and credited to Account 115. Other repayments were remitted from time to time independently by the employees, including Lockwood. On September 15 and December 30, 1959, Lockwood received checks in the amounts of $16,500 and $5,600, respectively, from Pioneer Manufacturing. These checks were credited to cash disbursements and debited to Account 115. A bonus in favor of Lockwood in the gross amount of $20,832.67 was declared in 1960, but he received a check for only $3,445.12. This was due to the withholding of $3,554.88 for Federal tax and to a special deduction of $13,832.67 which was credited to Account 115. This entry left a balance in Account 115 of $12,978.52 owed by Lockwood. Lockwood reported the full $20,832.67 as taxable income on his 1960 Federal income tax return. In March 1961, while Lockwood was away on a trip, he was telephoned by his brother and told that the Polverinis had terminated his employment. He immediately returned to Los Angeles and entered into negotiations with Ray Polverini concerning the terms of his discharge. An oral agreement was *31 reached. On March 29, 1961, Lockwood submitted his written resignation, as a director of Pioneer Manufacturing, effective March 31, 1961. On March 31, 1961, $2,000 was debited to Account 115 and credited to accrued bonuses. The purpose of this entry was to reclassify as an advance a bonus paid to Lockwood in 1958, a year when no bonuses were declared. After this entry, Account 115 had a debit balance against Lockwood of approximately $15,000. The books and records of Pioneer Manufacturing indicate that, when the bonus was paid in 1958, Federal income tax was withheld therefrom. On April 14, 1961, Lockwood met with Ray Polverini, with Polverini's attorney, and with the secretary-treasurer of Pioneer Manufacturing to sign documents which reflected the major portion of the oral agreement Lockwood had made with Ray Polverini. He signed a document entitled "Agreement Terminating Employee's Trust" (hereinafter referred to as the discharge agreement), which provided that Pioneer Manufacturing would pay Lockwood $15,000 in the form of canceling a recited indebtedness of that amount and that the employee's trust agreement was terminated in consideration thereof. Lockwood also signed a document *32 entitled "General Release" which recited that, in consideration of the receipt of $12,500 severance pay, he released any claim he had against Ray Polverini and nine corporations of the Polverini group. In 1961, he received $7,500 severance pay from Pioneer Manufacturing and $5,000 from Pioneer Distributing, which was reported in his Federal income tax return and that of his wife. The $15,000 representing discharge of Lockwood's indebtedness was not reported in those returns. On April 28, 1961, $15,000 was credited to Account 115 to reflect the discharge agreement. The records of Pioneer Manufacturing contained minutes of a meeting of the board of directors on March 29, 1961. Lockwood signed a waiver of notice of such meeting. The minutes recited the presence of Lockwood, but he actually did not attend and did not see the minutes until shortly before the trial herein. The minutes contained the following: The Chairman of the Board, Ray A. Polverini, informed the Board of Directors that James R. Lockwood had tendered his resignation as a Director of this corporation, effective as of March 31, 1961, and that Mr. Lockwood was terminating his employment by this corporation, effective *33 as of said date. After discussion, and upon motion duly made, seconded and carried, the following resolution was adopted: RESOLVED, that the resignation of James R. Lockwood as a Director of this corporation be accepted, and his 1465 employment by the corporation terminated, effective as of March 31, 1961, and that this corporation pay to Mr. Lockwood the sum of Seven Thousand Five Hundred Dollars ($7,500) as and for severance pay and in consideration of the full and complete release of all claims, debts, demands, cause or causes of action said James R. Lockwood has had, or now has against said corporation, exclusive of such claims, debts, demands, cause or causes of action said James R. Lockwood may have under and by virtue of the employee's trust agreement entered into by and between this corporation and James R. Lockwood under date of December 15, 1958. The Chairman of the Board thereupon informed the members of the Board that Mr. James R. Lockwood had asserted his claim against the corporation and made a demand upon the corporation for the payment to him of the sum of Fifteen Thousand Dollars ($15,000), accrued under and by virtue of the employee's trust agreement of December 15, 1958 between *34 this corporation and Mr. James R. Lockwood. The Chairman of the Board further stated that James R. Lockwood was indebted to the corporation for a balance due it in the sum of Fifteen Thousand Dollars ($15,000) for and on account of sums of money theretofore advanced by Pioneer to him, and that Mr. James R. Lockwood had expressed his consent and approval to the payment of the indebtedness owed by him to Pioneer by crediting to, or offsetting against said indebtedness the sum of Fifteen Thousand Dollars ($15,000) claimed by Mr. James R. Lockwood under and pursuant to the employee's trust agreement of December 15, 1958, and he agreed to assign and transfer to this corporation all of his right, title and interest under and by virtue of that certain policy issued by Manufacturers Life Insurance Company in the amount of $100,000 on the life of James R. Lockwood, as insured, with this corporation as beneficiary, for the purpose of funding the installment payments payable under said employee's trust agreement. After discussion, and upon motion duly made, seconded and carried, it was RESOLVED, that the employee's trust agreement dated December 15, 1958, executed by Pioneer, as employer, and *35 James R. Lockwood, as employee, be and is canceled and terminated, and that Pioneer pay to James R. Lockwood the sum of Fifteen Thousand Dollars ($15,000) in full and final payment of all sums accrued or to accrue under and by virtue of said employee's trust agreement upon and by reason of his separation as an employee from the service of Pioneer as his employer, and that such payment of Fifteen Thousand Dollars ($15,000) be made to James R. Lockwood by offsetting said sum against the sum of Fifteen Thousand Dollars ($15,000) due to Pioneer from Lockwood, and canceling said indebtedness by crediting said sum of Fifteen Thousand Dollars ($15,000) thereon. BE IT FURTHER RESOLVED, that the president and secretary of this corporation execute on behalf of this corporation such papers and documents as may be necessary to terminate the employee's trust agreement dated December 8, 1958, executed by and between James R. Lockwood and this corporation, and to obtain from said Lockwood an assignment of all of his right, title and interest under and by virtue of that certain policy issued by Manufacturers Life Insurance Company in the amount of One Hundred Thousand Dollars ($100,000) for the *36 purpose of funding the installment payments payable under said employee's trust agreement. The Country Club Membership and The Thunderbird Sometime during 1959, Lockwood approached Ray Polverini and asked him if Pioneer Manufacturing would buy a membership in the Oakmont Country Club. He explained that it would be useful to him in entertaining customers. It was understood that Lockwood would use it for personal as well as business purposes. Lockwood then applied for membership in his own name. Corporations were not permitted to hold memberships directly. Pioneer Manufacturing paid for the membership in July 1959 and carried the $2,400 cost on its books as an asset. At that time, Lockwood and the Polverinis did not contemplate any separation and so they made no specific agreement of any kind about who owned the membership. Neither Lockwood nor his wife reported income from receipt of the membership on their 1959 Federal income tax returns. The membership at all times stood in Lockwood's name. The club mailed bills to him and not to the company. The company reimbursed him for his business use of the club, but he paid the regular monthly dues and his personal bills. Lockwood *37 sold his membership in the country club for $1,500 in July of 1961. In early 1960, Pioneer Manufacturing purchased a 1960 Thunderbird automobile and permitted Lockwood to use it for both business and personal purposes. 1466 The California registration of the Thunderbird, dated July 14, 1961, showed Lockwood as the "registered owner" and Pioneer Manufacturing as the "legal owner." At the time the terms of Lockwood's discharge were negotiated, it was agreed that the company would take any necessary steps to transfer to Lockwood any interest it had in the country club membership or the Thunderbird. The records of Pioneer Manufacturing contained minutes of a meeting of the board of directors on May 9, 1961. Lockwood was no longer a director of Pioneer Manufacturing on May 9, 1961 and was not present at any such meeting. The minutes contained, after an explanatory preface, the following resolutions: RESOLVED, That as additional severance pay and in consideration for the full and complete release of all claims * * * James R. Lockwood * * * shall retain the membership in the Oakmont Country Club, standing and purchased by this corporation in the name of said James R. Lockwood; *38 and that this corporation transfer to said James R. Lockwood all of its right, title, and interest in and to that certain 1960 Thunderbird automobile, bearing Engine No. * * *. RESOLVED, FURTHER, That the President and Secretary of this corporation execute, on behalf of this corporation, such papers and documents as may be necessary to assign or transfer to said James R. Lockwood all of its right, title and interest in and to the aforementioned Oakmont Country Club membership and 1960 Thunderbird automobile. After his employment with Pioneer Manufacturing was terminated, Lockwood paid for insurance and repairs on the Thunderbird. Due to forgetfulness on the part of Pioneer Manufacturing's employees, the certificate of ownership was not sent to him until 1963. Neither Lockwood nor his wife reported any amount in their 1963 gross income in connection with his receipt of title to the Thunderbird. He sold the Thunderbird in 1964 for $1,500. Addition to Tax for Negligence Petitioners' 1961 returns were filled out by O. E. McMullen, an accountant and the father of petitioner Joyce Lockwood. O. E. McMullen never asked for any items of income other than those volunteered by Lockwood. *39 Lockwood volunteered items of income other than those relating to salary and bonus but did not volunteer information or inquire about the taxability of the items here in question. Petitioners' 1961 returns in no way reflect these items. Ultimate Findings of Fact 1. Petitioners realized $13,000 severance pay in 1961 in the form of discharge of Lockwood's indebtedness to Pioneer Manufacturing Co. 2. Petitioners realized $1,500 in income in 1961 in connection with Lockwood's membership in the Oakmont Country Club. 3. Petitioners realized $3,500 in severance pay in 1961 in the form of receipt of beneficial ownership of a Thunderbird automobile. 4. A part of the deficiency in tax was due to negligence on the part of each of the petitioners. Opinion The issues herein are all factual. The record is most unsatisfactory. The evidence is contradictory and much of the documentation is incomplete, particularly with reference to petitioners' own records and to the records of Pioneer Manufacturing relating to payments to and other financial transactions with Lockwood. Lockwood was the principal witness. He showed an amazing capacity to remember unimportant details and not to recollect *40 significant matters. Aside from the fact that much of his testimony was in the form of general statements and obviously self-serving, we found him unconvincing. We are persuaded that the full story has not been told. In essence, this case can be compared to an artichoke, only half of whose leaves have been eaten - the heart remains concealed. Discharge of Indebtedness The principal issue is whether petitioners realized $15,000 of income in 1961 in the form of forgiveness of indebtedness from Lockwood to Pioneer Manufacturing. Petitioners do not dispute the recognized principles that payments received in consideration of termination of employment are includable in gross income ( Ruth Jackson, 25 T.C. 1106 (1956); section 1.61-2(a)(1), Income Tax Regs.) and that the discharge of an indebtedness may result in realization of income by the debtor ( section 1.61-12, Income Tax Regs.). Their contention is simply that there was no indebtedness. 1467 Petitioners make two basic assertions. The first rests upon Lockwood's testimony *41 that he never executed any notes or other evidence of indebtedness and never received any advances from Pioneer Manufacturing, his former employer, either directly or in the form of merchandise purchased on Pioneer Manufacturing's credit, and additional evidence as to Lockwood's financial resources which purportedly shows that he was not in need of money. The second is that the entries in Account 115 are false and that the minutes of the meeting of the board of directors of Pioneer Manufacturing do not reflect the true situation. To a large degree, the foregoing assertions are founded upon non sequiturs. The fact that there is no formal recognition of an advance by way of a note or other evidence of indebtedness does not necessarily mean that there was no indebtedness - advances on open account are commonplace. The fact that a person has substantial financial resources does not necessarily show that he did not borrow - it is not unusual for wealthy persons to incur debt even though they do not need to do so. That an actual meeting of a board of directors did not take place does not prove that the minutes do not in fact reflect the substantive matters described therein - the practice *42 of minutes without formal meetings is often indulged in by closely held corporations. Similarly, the fact that Lockwood, as a director, did not see the minutes does not show that they were inaccurate. With respect to Account 115, if we were to accept petitioners' assertions that it was fictitious, the fiction penetrated the length and breadth of the accounts of Pioneer Manufacturing. We find particularly significant the fact that some of the credit entries in Account 115 were derived from with-holdings from the paychecks of employees other than petitioner. If Account 115 was a fabrication, so were the payroll accounts. We do think, however, that the reclassification, on March 31, 1961, of $2,000 from a 1958 bonus to a debit in Account 115 should not be accepted. According to the books and records of Pioneer Manufacturing, Lockwood received a bonus in that amount in 1958 on which tax seems to have been withheld. It appears that such bonus was taxable to him in that year. To be sure, no bonuses were authorized by the board of directors during that year, but this is insufficient proof of nonpayment in the face of the evidence that payment was in fact made. We hold that the $15,000 income *43 from discharge of indebtedness received by Lockwood in 1961 should be reduced by that amount. Similarly, we are not impressed with petitioners' attempt to draw sustenance from the facts that respondent had subpoenaed Ray Polverini, that he was present throughout Lockwood's testimony at the trial, that respondent then chose not to call him as a witness, and respondent gave the explanation that he was "impeachable." Aside from the fact that respondent's explanation was off-the-record, the fact is that we do not know the basis for the statement. Moreover, there is no ground for inferring that Polverini's testimony would have corroborated that of Lockwood. Indeed, if that were the case, petitioners presumably would have called him in aid of discharging their burden of proof. At best, we can only infer that Polverini would have given contradictory evidence, which we might have chosen not to believe. In the context of this case, where petitioners, not respondent, have the burden of proof, we will not transmute respondent's failure to call Polverini from a potential adverse effect on respondent's case to an actual corroboration of petitioners' position. [2] Cf. Thomas E. Snyder Sons Co. v. Commissioner, 288 F. 2d 36 *44 (C.A. 7, 1961), affirming 34 T.C. 400 (1960). Two hard facts stand out herein. First, on April 14, 1961, Lockwood himself signed an agreement which recited that he was indebted to Pioneer Manufacturing to the extent of $15,000. Second, Lockwood concedes that he received $16,500 on September 15, 1959 and $5,600 on December 30, 1959. His claim that these were part of the proceeds of his sale of Pioneer Manufacturing stock earlier in the year is belied by the fact that he did not report them on his 1959, tax return, in which he only reported the $24,000-odd received from the Polverinis and showed no profit or loss from such sale. In short, not only was Lockwood's testimony inherently unconvincing, but his own actions directly contradict his assertions. Moreover, although Lockwood testified that he believed that he had no rights under the employee's trust agreement in 1961, we are far from satisfied that he did *45 not assert such a claim in the termination 1468 negotiations, the satisfaction of which would clearly have constituted income. Obviously we are not required to accept Lockwood's testimony as gospel. See, e. g., Fleischer v. Commissioner, - F. 2d - (C.A. 2, Oct. 31, 1968), affirming a Memorandum Opinion of this Court; National Fireworks v. Commissioner, 243 F. 2d 295, 297 (C.A. 1, 1957); Archer v. Commissioner, 227 F. 2d 270, 273 (C.A. 5, 1955). Stanley C. Wood, T.C. Memo. 1968-112, heavily relied upon by petitioners, is clearly distinguishable on its facts. Under these circumstances we need give little, if any, weight to the March 29, 1961 minutes to support our conclusion that an indebtedness existed. [3]
*46 As we view this case, Lockwood may not have known the precise contents of how his financial transactions with Pioneer Manufacturing were to be reflected on its books and records. But he knew their substance. Perhaps he originally wanted to receive both the approximately $24,000 and the additional amounts of $16,500 and $5,600 as payment for his stock. For reasons which are not revealed in the record before us, he agreed to a different arrangement. Keeping in mind that both petitioners and Pioneer Manufacturing were subject to approximately a 50-percent rate of tax, it requires little imagination to correlate the amounts Lockwood received (including the $20,832.67 bonus in 1960 and the severance pay of $12,500 in 1961) net after taxes and repayments to, and withholdings by, Pioneer Manufacturing, and the tax benefit of those payments to Pioneer Manufacturing with the situation which would have obtained had the payments been made in accordance with Lockwood's claimed original wish. Petitioners have thus failed to meet the burden of proof upon them to overcome the presumptive correctness of respondent's determination. The Country Club Membership and The Thunderbird The second *47 issue is whether Lockwood received the country club membership for tax purposes in 1961 or in 1959. The membership was purchased by Pioneer Manufacturing in the earlier year. Lockwood testified that there was no agreement made with respect to its ownership. Pioneer Manufacturing carried the cost of the membership as an asset on its books, which is consistent with its retention of ownership. That Lockwood paid the monthly dues from 1959 on reflects nothing more than the fact that he was entitled to use the membership for the benefit of himself as well as Pioneer Manufacturing. Lockwood himself admitted that he was uncertain as to his obligation with respect to any proceeds of sale if he had sold the membership prior to March 31, 1961. The minutes of the meeting of the board of directors of Pioneer Manufacturing on May 9, 1961 confirm the intention of the company to relinquish its interest in the membership. [4] In view of the foregoing, we hold that he realized income to the extent of its value when it was agreed that he could retain the membership as his own property at the time of termination of his employment. Lockwood testified that he sold the membership in 1961 for $1,500. Since *48 there is no evidence indicating the contrary, we accept such testimony as determinative of its value on March 31, 1961. Accordingly, we hold that Lockwood received income of $1,500 in the form of such membership in 1961. [5]
The third issue involves the Thunderbird automobile. We are again presented with a conflict of evidence as to the basic facts. According to Lockwood's testimony, he and Ray Polverini agreed that Lockwood could keep the car for a maximum of two years after the termination of his employment, at which time he would return it to Pioneer Manufacturing. The former 1469 secretary-treasurer of Pioneer Manufacturing testified that it was only by oversight that Lockwood failed to receive the certificate of ownership until 1963. Her testimony is confirmed by the May 9, 1961 minutes. [6] Moreover, the fact that Lockwood paid for repairs and insurance after the termination of his employment indicates that he considered the car his from that time on. [7]
*49 The fact that Lockwood did not receive the certificate of title to the Thunderbird until 1963 does not mean that, as against Pioneer Manufacturing, he had no right to the car. Even assuming that California law would be a significant consideration in the determination of ownership for Federal income tax purposes, it would appear that he acquired the right to have the certificate of title endorsed over to him no later than 1961. [8] See Stoddart v. Peirce, 53 Cal. 2d 105, 346 Pac. 2d 774 (1959); Civil Service Employees Insurance Co. v. Wilson, 222 Cal. App. 2d 519, 35 Cal. Rptr. 304 (1963); Pendell v. Thomas, 95 Cal. App. 33, 272 Pac. 306 (1928). We hold that petitioners acquired sufficient claim of right to the Thunderbird in 1961 so that it was taken into income in that year. Cf. Thomas W. Blake, Jr. 20 T.C. 721 (1953). Since petitioners presented no evidence to the contrary, we must accept respondent's determination that the automobile was worth $3,500 at the critical date. Negligence The final issue is whether respondent *50 erred in asserting a 5-percent addition to tax for negligence against petitioners under section 6653(a). The burden of proof rests upon petitioners. David Courtney, 28 T.C. 658, 669-670 (1957). Since petitioners filed separate returns, each petitioner's negligence must be determined separately. If negligence is established with respect to part of the assessed deficiency, the negligence penalty attaches to the whole deficiency. Robert L. Bunnell, 50 T.C. 837 (Sept. 9, 1968). With respect to petitioner James Lockwood, he knew he had received sums from his employer in previous years and that he did not consider those sums income at the time of receipt. We have found that he was in fact indebted to Pioneer Manufacturing when his employment was terminated. We think that he should have recognized that he might well be subject to Federal income tax on the discharge of that indebtedness. Cf. Gouldman v. Commissioner, 165 F. 2d 686 (C.A. 4, 1948), affirming a Memorandum Opinion of this Court. The record reveals no inquiries by Lockwood specifically about *51 the tax effect of the 1961 transactions. Since he has the burden of proof, we conclude that his failure to include such discharge in his 1961 income was negligent. Petitioners presented no evidence whatsoever bearing on petitioner Joyce Lockwood's role in the preparation of her income tax return. Indeed, they presented almost no evidence having any bearing on her at all. For aught that appears, she could have been as familiar as her husband with the transactions giving rise to the forgiveness of the indebtedness in 1961. On this state of the record, we have no choice but to hold that petitioner Joyce Lockwood failed to sustain her burden of proof. Our holding in L. Glenn Switzer, 20 T.C. 759, 766 (1953), is distinguishable, since, in that case, the Commissioner had the burden of proof. And in Elsie SoRelle, 22 T.C. 459, 489 (1954), there was some evidence relating to the lack of knowledge of the wife. Decision will be entered under Rule 50. Footnotes
1. All references are to the Internal Revenue Code of 1954, unless otherwise stated.↩
2. Polverini's letter to the Internal Revenue Service dated August 26, 1964 (Petitioners' Exhibit 137), which was offered in connection with Lockwood's post-trial deposition and which we now admit in evidence, adds no significant support to petitioners' case.↩
3. Petitioners argue on brief that the various minutes are not competent evidence against strangers to prove contracts with them absent proof that they knew and assented thereto, citing Niederkrome v. Commissioner, 266 F. 2d 328↩ (C.A. 9, 1958), affirming in part and remanding in part a Memorandum Opinion of this Court. We consider that case clearly distinguishable since it involved minutes which were not property identified as such and which covered the purported deliberations of parties who were not participants in the actual transaction before the Court. Moreover, the holding of Niederkrome seems to rest on the proposition that the minutes therein were self-serving. In this case, the May 9 minutes were certainly not self-serving with respect to Pioneer Manufacturing; quite the contrary, since on their face, they divested the company of ownership. In addition, it seems to us that petitioners waived any objection based on competency of the minutes by the terms of their stipulation, which limited their objections to materiality and relevancy. See p. 20, infra.
4. See footnote 3, supra. ↩
5. Respondent has made no claim that petitioner should be taxable on that protion of the value of the use of the membership for personal purposes prior to March 31, 1961.↩
6. See footnote 3, supra. ↩
7. Apparently, neither Pioneer Manufacturing nor Lockwood paid for any repairs prior to 1961, because the car was under warranty.↩
8. Petitioners made no contention that Lockwood received ownership of the Thunderbird prior to 1961.↩