Herbert Luke and Cecille Luke, et al. 1 v. Commissioner. Luke v. CommissionerDocket Nos. 88890-88892, 89322.United States Tax CourtT.C. Memo 1964-176; 1964 Tax Ct. Memo LEXIS 163; 23 T.C.M. (CCH) 1022; T.C.M. (RIA) 64176; June 23, 1964*163 1. Arlington Corp. (now Interestate Steel Co., the corporate petitioner herein) during its fiscal period February 1, to December 31, 1955, suffered a net operating loss of $628,296.70 in its machine shop business in St. Paul, Minnesota, resulting largely from the production of military items for the United States Government. During 1956 Arlington had a net profit of $2,085.84, and in 1957 again had a loss of $96,764.05. During said period Arlington was virtually insolvent, under the control of its creditors, and was unable to continue in business. During this period Howard Conant was the principal stockholder in both Interstate Steel Co. (Illinois) and Interstate Steel Co. of Minnesota (Minnesota). Illinois, several times larger than Arlington, was making large profits in the business of importing, distributing and warehousing steel. Illinois' stockholders also owned the stock of Minnesota, which operated a sales office and bought steel in St. Paul, and which also consistently enjoyed substantial profits. In November 1956 the stockholders of Illinois and Minnesota (known as the Conant group) purchased all of Arlington's stock and about $240,000 of its notes from outside creditors *164 for a total outlay of about $125,000. Immediately prior to the acquisition of Arlington in 1956, Illinois and Minnesota had a surplus of about $1,351,648.13 and $54,834.06, respectively. After 14 months, during which time Arlington unsuccessfully manufactured trailer hitches and performed certain job shop civilian work, on January 15, 1958, Arlington acquired the assets of Illinois and Minnesota in exchange for shares of its own stock, amended its charter to cover the activities of Illinois and Minnesota, changed its name to Interstate Steel Co., transferred its assets to the business situs of Illinois, and thereafter carried on the business formerly done by Illinois and Minnesota. On May 20, 1958, Arlington's franchise for the trailer hitch and all of its assets were offered for sale at auction under its old name. In its corporate tax return for fiscal year 1958, Arlington (now Interstate Steel Co.) claimed a net operating loss carryover deduction from the fiscal period February 1, to December 31, 1955, and from the calendar year 1957, in the aggregate amount of $487,692.88. Held: That the principal purpose of the stockholders of Illinois and Minnesota for acquiring control of Arlington *165 was to evade or avoid Federal income tax by securing to themselves the benefit of Arlington's (now Interstate Steel Co.) net operating loss deductions, which said stockholders would not have otherwise enjoyed. Accordingly, the corporate petitioner is not entitled to carry over said net operating losses against the profits of the merged corporations for the taxable year 1958. Sec. 269, I.R.C. 1954. 2. In 1956, when the Conant group (the individual petitioners herein) purchased all of Arlington's stock, it also acquired about $240,000 of notes payable by Arlington to creditors for approximately $100,000. The respective interests of the members of the Conant group in said notes were in the same proportions as their respective interests in Arlington's stock. Minnesota, controlled by Conant, charged against its bad debt reserve for 1956 its note of Arlington in the amount of $34,804.71 as worthless. In 1958, after the merger of Minnesota and Illinois with Arlington, the Conant group sold their Arlington notes in the face amount of $228,236.59 to a bank at a normal discount rate. Neither the sale of the notes to the bank nor the payments of any of the amounts due thereon would have been *166 possible except for the merger transaction of January 1958, whereby the assets of Minnesota and Illinois were made subject to payment thereof. Held: The acquisition of said notes in 1956 was an integral part of the entire merger transaction and was for the principal purpose of securing a tax benefit proscribed by sec. 269, supra. In reality, the amounts paid by the Conant group in 1956 to acquire said notes represented equity investment in Arlington by the individual petitioners. Held further, that amounts received by the individual petitioners from the bank in 1958 from the sale of said notes constitute a distribution of earnings and profits from Interstate Steel Co. in the nature of a dividend and taxable as ordinary income within the purview of sec. 316(a)(2), Code of 1954. Harold R. Burnstein, 105 W. Adams St., Chicago, Ill., for the petitioners. Seymour I. Sherman, for the respondent. FISHERMemorandum Findings of Fact and Opinion FISHER, Judge: Respondent determined deficiencies in petitioners' income taxes for the calendar year 1958 in the following amounts: 2*167 DocketNo.PetitionerAmount88890Herbert Luke and CecilleLuke$ 3,640.2488891Howard R. Conant andDoris Conant120,838.6288892Estate of Lawrence Farkas,Deceased, et al.3,816.4689322Interstate Steel Co.184,203.95The issues presented for our consideration are: (1) Whether the corporate petitioner in Docket No. 89322 is entitled to carry over net operating losses in the amount of $487,692.88 from the fiscal period February 1 to December 31, 1955, and from calendar year 1957 against its earnings realized in the taxable year 1958, and (2) whether proceeds realized from the sale of certain notes sold by the individual petitioners herein are taxable as ordinary income or as capital gains. Findings of Fact Some of the facts have been stipulated and, together with exhibits, are incorporated herein by reference. Petitioners, Herbert Luke (hereinafter referred to as Luke) and Cecille Luke, were at all times material husband and wife residing in Highland Park, Illinois. They filed a joint income tax return for the calendar year 1958, the year in question, with the district director at Chicago, Illinois. Petitioners, Howard R. Conant (hereinafter referred to as Conant) *168 and Doris Conant, were at all times material husband and wife residing in Glenview, Illinois. They filed a joint income tax return for the calendar year 1958 with the district director at Chicago, Illinois. Petitioners, Estate of Lawrence Farkas, Deceased, et al., (hereinafter referred to as Farkas) and Regina Farkas, were during the relevant taxable year husband and wife residing in Highland Park, Illinois. They filed a joint income tax return for the calendar year 1958 with the district director at Chicago, Illinois. Petitioner in Docket No. 89322 is the Arlington Corp. (hereinafter referred to as Arlington) and was organized on January 30, 1951, under the laws of the State of Minnesota and had its principal office and place of business, until 1958, in St. Paul, Minnesota. On January 15, 1958, its name was changed to Interstate Steel Co. (hereinafter referred to as Interstate) and had its principal place of business moved to Evanston, Illinois. Arlington filed its corporate income tax return for the fiscal year ending January 31, 1952, with the collector of internal revenue and for the years 1953, 1954 and 1955, and a short fiscal period February 1, 1955, to December 31, 1955, and *169 the calendar years 1956 and 1957 with the district director at St. Paul, Minnesota. In 1958 Interstate Steel Co. (formerly Arlington) filed its corporate income tax return for the calendar year 1958 on the accrual basis with the district director at Chicago, Illinois. Arlington's original capitalization consisted of 500 shares of common stock with a par value of $100 per share, of which 400 shares were owned by Cortland J. Silver (hereinafter referred to as Silver). About July 10, 1953, the other 100 shares of its stock were purchased and retired by Arlington. Thereafter, and until November 8, 1956, Silver was Arlington's sole stockholder. Arlington was incorporated to acquire and continue a business established in 1912. The principal operations of said business, and of Arlington from its inception were those of a machine shop rather than those of a manfacturer, that is, the performance of work under specific contracts or subcontracts rather than the manufacturer of a proprietary item, i.e., its own line of goods. When first organized, Arlington's advertising and publicity material indicated principally a machine shop operation. It also held itself out as manufacturing a line of metal *170 trays. The record does not disclose the extent of this latter activity, the portion of Arlington's manufacturing operations and facilities devoted thereto, or the portion of its income attributable thereto. This latter activity, however, never represented a major phase of petitioner's business or activities, received only a minor share of the publicity devoted to Arlington's operations as contrasted with that devoted to its machine shop operations, and was never responsible for more than a minor part of petitioner's sales and gross income. Arlington had within its possession a prototype of a trailer hitch which it contemplated producing sometime in the future. Arlington operating primarily as a machine shop performed work for the United States Government on a contract basis. One of these contracts was with the Department of the Navy and consisted of the production of practice bombs. From its inception and through its fiscal year ended January 31, 1953, contract work subject to the Renegotiation Act of 1951 accounted for over 50 percent of Arlington's gross sales. Thereafter and until some time in 1956, such contracts accounted for almost 100 percent of Arlington's gross sales. At no *171 time prior to January 15, 1958, did Arlington sell or warehouse steel. By September 21, 1956, Arlington was exclusively a job shop and did not have a product or line of its own. In 1957, Arlington derived no income from contracts or subcontracts subject to the Renegotiation Act of 1951. Arlington's returns from its inception through the calendar year 1957 show the following net or taxable income (loss) as follows: Taxable Year or PeriodIncome (Loss)F/Y/E 1-31-52$ 26,356.39F/Y/E 1-31-5326,984.84F/Y/E 1-31-54( 65,696.80)F/Y/E 1-31-55252,688.11Period 2-1-55 to 12-31-55(628,296.70)Calendar year 19562,085.84 aCalendar year 1957( 96,746.05)Arlington carried on its operations at two separate plants known as Plant No. 1 and Plant No. 2. In 10 months ending October 31, 1956, Arlington had sales in Plant No. 1 (where it did its regular work, exclusive of Government contract work) of $389,197.85. Plant No. 2 burned down on February 13, 1956, and Arlington's *172 Government work therein ceased. Manufacturing operations at that plant were never resumed. Thereafter, pursuant to a creditor's committee, which had been organized to consider the fiscal problems of Arlington, the Government contract was assigned to another company. During Arlington's fiscal year ended January 31, 1955, and its fiscal period February 1 to December 31, 1955, its activities at its two plants and the net profit (loss) from such operations, according to its books, were as follows: PeriodFiscal Year EndedPeriodPlant1-31-552-1-55 - 12-31-55Plant No. 1 - Regular Work($213,864.76)($ 99,199.38)Plant No. 2 - Booster Renovation478,368.89Plant No. 2 - U.S. Navy Practice Bomb( 420,777.28)Net income (loss) per books$264,504.22($519,976.66) Throughout the existence of Arlington, prior to the transaction between Cortland Silver, who was president of Arlington, and the individual petitioners as hereinafter described, the only items of business specifically noted in its corporate minutes referred to Government contract work of an essentially military nature. Arlington began to experience financial and operational difficulties at least by early 1954. Silver pledged his personal assets *173 in or prior to February 1954 in order to permit the corporation to place itself in a position to meet its responsibilities with respect to military production commitments. In 1955 Silver agreed to advance funds to the corporation and to waive withdrawals of his salary. By May 14, 1956, Arlington had substantially reduced its operations, substantially changed its management, and laid off sufficient employees to effect a reduction of $1,800 per month in its payroll. By no later than July 1956 Arlington's financial condition was such that it was impossible to borrow money from a bank. Its equipment was antiquated and required replacement in order to operate properly. Arlington's balance sheet as of December 31, 1955, shows a deficit in stockholder's equity in the amount of $262,031.18, and a deficit in retained earnings in the amount of $399,398.56. In computing stockholders' equity, Arlington's balance sheet shows an addition thereto in the amount of $97,367.38, designated as "Stockholders' Equity arising out of Revaluation of Fixed Assets." Without this latter item, the deficit in stockholders' equity as of December 31, 1955, would be in the amount of $359,398.56. Arlington's balance *174 sheet as of December 31, 1956, shows a deficit in stockholders' equity in the amount of $185,309.31, and a deficit in retained earnings in the amount of $396,611.76. In computing stockholders' equity, Arlington's balance sheet shows an addition thereto in the amount of $82,010.62, designated as "Stockholders' Equity arising out of Revaluation of Fixed Assets." Without this latter item, the deficit in stockholders' equity as of December 31, 1956, would be in the amount of $267,319.93. By no later than December 1955 Arlington was unable to meet its obligations, and it was necessary to obtain a moratorium from its creditors in order to continue in business. Arlington's creditors granted a 60-day moratorium and elected a creditors' committee to act in an advisory capacity. The moratorium was viewed, not as an ultimate solution to Arlington's problems, but as providing the time necessary for the creation of a definite plan for eventual liquidation of its debts. In February of 1956 a plan was adopted by Arlington's 21 principal creditors, accounting for approximately $210,000 of its unsecured indebtedness. Under this plan, three classes of creditors were recognized. Class A creditors, those *175 with claims from $100 to $1,000, were offered a cash settlement of 50 cents on the dollar, or, in the alternative, 75 cents on the dollar, payable in three installments. Class B creditors, those with claims from $1,000 to $7,500, were offered a cash settlement of 35 cents on the dollar, or, in the alternative, 60 cents on the dollar payable in three installments. Class C creditors, those with claims in excess of $7,500, were to receive three payments of 10 percent each at the same time as each respective installment payment to the other creditors, a fourth payment of 10 percent one year thereafter, and, another year later, the balance still owing in the amount of 60 percent of the original Class C indebtedness. At that time it was the opinion of Associated Creditors, Inc., representing the creditors, that enforcement of the rights of creditors and liquidation of Arlington in pursuance thereof would result in a recovery of not over 15 percent. A document entitled "Creditors Extension Agreement of Arlington Corporation" was sent to each creditor, which read, in part, as follows: * * *NOW, THEREFORE, in consideration of the covenants, agreements and undertakings hereinafter contained *176 on the part of the First Party to be observed and performed by it, the Creditors Committee and the Creditors, and each of them, grant unto the First Party full, free and absolute liberty and license to carry on its business under the supervision, inspection and controls as hereinafter set forth from the date of these presents until the 14th day of February, 1961 or sooner if said Creditors' claims have been paid in full. As a further consideration of the covenants herein contained on the part of First Party, the said Creditors Committee and the Creditors consent and agree with the First Party, its successors and assigns, that they, their representatives, successors or assigns, will not, contrary to the true intent and meaning of this agreement, sue, attach, garnish, execute under judgment or otherwise molest the First Party or take any legal action whatsoever for the purpose of enforcing the collection of their indebtedness; nor will they make an application for the appointment of a receiver for the debtor; nor will they file or join in any petition in bankruptcy under the various sections of the Bankruptcy Act against the debtor contrary to the terms of this agreement, the consent *177 of said Creditors and the Creditors Committee being irrevocable during the term of this agreement. It is further agreed that during the term of this agreement, the First Party shall not without the consent of its Board of Directors dispose of any of its property except in the usual course of its business; nor shall it further encumber any of its assets, save and except upon the consent of its Board of Directors; the First Party shall not during the term of this agreement act as a guarantor for any third person, nor become liable as a surety on any bond without the written consent of its Board of Directors. * * *First Party further agrees that it will not voluntarily do anything whereby any preference or priority of payment or security shall be given to any of its present unsecured creditors contrary to the true intent of this agreement. First Party agrees that it shall immediately upon the acceptance of this agreement by the requisite majority of creditors hereinafter designated amend its Articles of Incorporation and By-Laws increasing its Board of Directors to nine in number and setting up two classes of directors who shall be known as Class A directors and Class B directors. The *178 Class A directors shall be five in number and the Class B directors shall be four in number. Creditors who are a party to this agreement shall have the right to elect all Class A directors in any manner which is agreeable to them. The party of the first part shall have the right to elect all Class B directors. The Board of Directors shall act by majority vote, and each director shall have one vote without regard to classification of director. Vacancies in the office of any Class A director shall be filled by designation of the remaining Class A directors without participation of the Class B directors. Until further elected, the Class A directors herein shall be the following: Howard Conant of Chicago, Illinois, Interstate Steel Company Gerard A. Thompson, Minneapolis, Minnesota, General Box CompanyE. H. Longhibler of Chicago, Illinois, Air Reduction Sales Company L. J. Tieso of St. Paul, Minnesota, Tieso Electric Company Frederick T. McFall of Indianapolis, Indiana, American Fabricated Products CompanyCortland J. Silver, who owns all the issued outstanding common capital stock of the First Party further agrees that he will pledge to the members constituting the Class A directors *179 for the benefit of all creditors signing this agreement 49 percent of the issued outstanding common capital stock of said First Party to be held in trust for the benefit of all creditors entering into this agreement, which said stock shall be held by the Class A directors, or some nominees of said Class A directors so designated by them, as collateral to the payment of the undertakings herein evidenced by the party of the first part; said pledge of stock shall be as security only, and there shall be no foreclosure of said pledge unless and until there has been a default in the terms of this agreement by said First Party. * * *It is further understood and agreed by and between all the parties hereto that this agreement shall not be deemed operative until the following have happened: (a) written consents received in the office of J. J. Mickelson of 100 percent of the Class C creditors affected by this agreement; (b) written consent and acceptance by 85 percent of the total number of dollars of creditors falling into Categories A and B received in the office of J. J. Mickelson. * * *On or before April 13, 1956, a sufficient number of creditors had accepted the aforesaid "Creditors Extension *180 Agreement" to make it operative, and on that date a first dividend was mailed to each creditor pursuant to the terms thereof. A letter by Silver to the creditors, reads as follows: April 13, 1956 TO CREDITORS: Re: Arlington Corporation, 668 Jenks Avenue, St. Paul, MinnesotaIt is indeed with a great deal of pleasure and satisfaction that we enclose a letter from the Creditors Committee, together with our check representing the dividend due you under the Creditors Extension Agreement dated February 14, 1956. Through your very kind consideration and cooperation, you have made it possible for our company to remain in business, and we wish to take this opportunity to thank you sincerely. As you may well know, the Navy Bomb Contract at Plant No. 2, was the major reason for our financial difficulty, and with this contract now completed, we will now be able to concentrate our efforts toward the acquisition of new work for Plant No. 1. As you know, this company has been in business for many years, and we are qualified to handle all types of job shop work and production run. If you know of any jobs that would fit our plant, we will be more than happy to bid on these jobs. It is going to take *181 a short period of time to convert to strictly civilian production, and we can use this type of work now. * * *It is our earnest hope and endeavor that we will be able to continue to do business with you in the future on a mutually profitable basis. Sincerely, (Signed) Cortland J. Silver, Cortland J. Silver, President As a result of the aforesaid financial difficulties, the consenting creditors accepted notes in lieu of the amounts due them on open account, after the afore-mentioned dividend. Dissenting creditors were paid in cash after cancelling a portion of the indebtedness due them, such cancellation being in the total amount of $89,291.83. Said amount of $89,291.83 was not reflected in Arlington's 1956 income. Arlington was insolvent both before and after such cancellation. Creditors who consented to the substitution of notes for open account indebtedness received notes payable as follows: Dates PayableCreditorsTotal4-15-574-15-584-15-594-15-60Class A$ 5,798.81$ 2,449.89$ 3,348.92Class B10,190.864,413.085,177.78$ 600.00Class C264,347.8924,710.2232,797.1630,718.53$176,121.98Totals$280,337.56$31,573.19$41,323.86$31,318.53$176,121.98 None of the payments due as listed above were made *182 at any time prior to April 15, 1958. The payments due April 15, 1957, were, in each instance, extended to April 15, 1958. The first dividend to creditors, including payments to dissenting creditors, completely depleted Arlington's working capital. All Arlington's attempts to secure a loan from the Small Business Administration and from private sources met with failure. An expenditure of $30,000 was necessary for rehabilitation of machinery and equipment to render Arlington competitive. Arlington could not obtain profitable work because it lacked adequate machinery and equipment, and large firms would not do business with it, in view of its inadequate financial position. By September 1956 Arlington, despite the effecting of many economies, had had a further operating loss in the amount of $36,000 from April 15, 1956, the date of the creditor's extension agreement, through August 31, 1956. Attempts were made to interest potential buyers to acquire the business on an amalgamation basis, but with no success. Arlington's board of directors was at this time controlled by its creditors. Each member of the board of directors representing creditors was fully apprised of the foregoing conditions. *183 Howard R. Conant, one of the petitioners herein, was one of such creditor members of Arlington's board. Interstate Steel Co. (hereinafter called Illinois) was incorporated pursuant to Illinois law on August 28, 1948, as the successor to a sole proprietorship theretofore operated by Conant. It filed its income tax returns on the basis of a fiscal year ended October 31. The principal office and place of business of Illinois was at 2100 Greenwood Street, Evanston, Illinois. Its business activity until dissolution on January 15, 1958, consisted of the warehousing of steel and the selling of sheet steel. The original capitalization of Illinois consisted of 500 shares of common stock having a par value of $100 per share. On October 10, 1950, a 100 percent stock dividend was declared, and $50,000 was transferred from earned surplus to capital on the books of Illinois. At all times here material and until its dissolution on January 15, 1958, the capital stock of Illinois was held as follows: StockholderNo. of SharesConant540Doris Conant360Luke50Farkas50Total1,000Illinois did not engage in job shop, manufacturing or like work. Any connection with Arlington was solely that of a supplier of *184 raw materials, either directly or through a commonly controlled corporation. Although Illinois generally enjoyed substantial earnings, it paid no dividends to stockholders at any time from its fiscal year beginning November 1, 1950, until it terminated its existence in 1958. The record does not disclose any dividend payment prior to November 1, 1950. For its fiscal years ending October 31, 1951, to 1957, inclusive, and for its final fiscal period November 1, 1957, to January 15, 1958, Illinois reported net or taxable income (loss), and earned surplus and undivided profits as of the close of each respective taxable year or period as follows: Net or TaxableSurplus and Un-Taxable Year or PeriodIncome (Loss)divided ProfitsFiscal Year Ended 10-31-51$1,211,145.90$ 701,319.15Fiscal Year Ended 10-31-52339,479.72863,325.80Fiscal Year Ended 10-31-53278,985.59999,797.68Fiscal Year Ended 10-31-54(61,176.63)972,074.14Fiscal Year Ended 10-31-55228,633.311,086.702.27Fiscal Year Ended 10-31-56544,677.341,351.648.13Fiscal Year Ended 10-31-5795,287.111,400,175.56Period 11-1-57 to 1-15-582,913.861,402,215.26Interstate Steel Co. of Minnesota (hereinafter called Minnesota) was incorporated under Minnesota*185 laws on October 21, 1953. It filed its income tax returns on the basis of a fiscal year ended September 30. The principal office and place of business of Minnesota was in St. Paul, Minnesota. Its address for the purpose of filing its returns was c/o Interstate Steel Co., 2100 Greenwood Street, Evanston, Illinois. Minnesota's activities consisted of the operation of a sales office in St. Paul. It was formed by the same persons who controlled Illinois for the purpose of purchasing steel from the Granite City Steel Co., which did not sell steel in the Chicago area. Throughout its existence and until its dissolution on January 15, 1958, the capital stock of Minnesota was held as follows: StockholderNo. of SharesConant87 1/2Arnold Luke2 1/2Luke5Farkas5Total100At no time during its existence did Minnesota engage in job shop, manufacturing, or like work. Any connection with Arlington was solely that of a supplier of raw materials. Minnesota was Arlington's largest single creditor, and in the course of the events concerning Arlington and its creditors as hereinbefore described, received a note in the amount of $34,804.71 as a "Class C" creditor, payable as follows: Due DateAmount Due4-15-57$ 3,867.194-15-583,867.194-15-593,867.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,203.14At *186 no time during its corporate existence did Minnesota pay a dividend to its stockholders. For its first fiscal period October 21, 1953, to September 30, 1954, its fiscal years ending September 30, 1955, to 1957, inclusive, and its final fiscal period October 1, 1957, to January 15, 1958, Minnesota reported net or taxable income (loss), and earned surplus and undivided profits as of the close of each respective taxable year or period as follows: Surplus and Un-Net or Taxabledivided Prof-Taxable Year or PeriodIncome (Loss)its (Deficit)Period 10-21-53 - 9-30-54$ (404.37)$ (404.37)Fiscal Year Ended 9-30-5530,206.6319,999.18Fiscal Year Ended 9-30-5661,114.3354,834.06Fiscal Year Ended 9-30-5716,154.2466,142.03Period 10-1-57 - 1-15-588,613.9572,171.79Conant was the principal shareholder and dominant personality in both Illinois and Minnesota. He has been engaged full time in steel distributing and importing since 1946 when he was approximately 22 years of age. He never engaged in manufacturing, machine shop, or like activity, prior to the transaction of November 8, 1956, as set forth hereinafter. Nor did he continue to maintain any interest in such activity after the events of 1958 to be described *187 hereinafter. After Silver's failure to interest anyone in acquiring Arlington's business, Conant indicated an interest in acquiring the stock and notes of Arlington, but only if all could be acquired. Conant thereupon entered into negotiations with Silver with respect to the capital stock of Arlington. As a result of such negotiations an agreement dated September 12, 1956, was drafted and sent by Silver's attorney to Conant for his signature. This agreement draft contained, inter alia, the following provisions: * * *(1) As consideration therefor, Buyer agrees to pay to Seller, at Saint Paul, Minnesota, the sum of Sixty Thousand ($60,000) Dollars; provided, however, that if the net operating loss carry forward of Company as of September 30, 1956, is less than Three Hundred Sixty Thousand ($360,000.00) Dollars, the purchase price of Sixty Thousand ($60,000.00) Dollars shall be reduced by an amount equal to One ($1.00) Dollar for each Two ($2.00) Dollars that the net operating loss carry forward of Company is less than Three Hundred Sixty Thousand ($360,000.00) Dollars. In no event, however, shall the purchase price be reduced below Thirty Thousand ($30,000.00) Dollars, irrespective of *188 the net operating loss carry forward of Company. The term "net operating loss carry forward of Company" as used herein shall mean the net operating loss carry forward of Company as of December 31, 1955, as finally determined for Federal Income Tax purposes, plus the sum of Twenty-five Thousand ($25,000.00) Dollars and plus the net operating loss of Company between January 1, 1956, and September 30, 1956, as shown upon its books and records, based upon a physical inventory to be taken as of that date. Of the sum to be paid by Buyer to Seller pursuant to the provisions of this Paragraph 2, Buyer has paid to Seller the sum of Ten Thousand ($10,000.00) Dollars, the receipt whereof is hereby acknowledged; Buyer shall pay to Seller the further sum of Twenty Thousand ($20,000.00) Dollars at the time specified in Paragraph 3 hereof; and Buyer shall pay to Seller the balance of the purchase price, if any, at the time specified in Paragraph 4 hereof. Time is of the essence hereof. (3) This Agreement is contingent upon Buyer purchasing from the creditors listed in Exhibit A hereto, on or before December 1, 1956, the promissory notes therein referred to at an aggregate cost to Buyer, including *189 legal expenses in connection therewith, of One Hundred Thousand ($100,000.00) Dollars. For the purpose of this Paragraph 3, Buyer does hereby appoint Seller his agent for the purpose of negotiating such purchase with the creditors named in Exhibit A, and does hereby authorize Seller to employ counsel of his own choosing to render services in connection therewith. In the event that Buyer, or Seller as the agent for Buyer, is unable to so purchase the said promissory notes, this Agreement shall be void without liability to either of the parties and earnest money shall be forthwith refunded. In the event that the said promissory notes are so purchased, the sum of Twenty Thousand ($20,000.00) Dollars referred to in Paragraph 2 hereof shall be paid by Buyer to Seller within ten (10) days after completion of the purchase of the said promissory notes. Buyer agrees to make the said sum of One Hundred Thousand ($100,000.00) Dollars available to Seller or Seller's counsel for the purpose of purchasing the said promissory notes and for the legal expenses incidental to the purchase thereof, when all creditors named in Exhibit A have agreed thereto. In the event that Buyer, or Seller as Buyer's *190 agent, is not successful in so purchasing the said promissory notes, then the expenses of attempting to so do shall be borne equally by the parties. (4) Seller shall cause Company to make immediate application to the Internal Revenue Service for an audit of the Federal Income Tax returns of Company through December 31, 1955. Upon the completion of the said audit and the determination of the net operating loss carry forward of Company as referred to in Paragraph 2 hereof, Buyer shall pay to Seller the balance of the purchase price specified in Paragraph 2 hereof. * * *Conant did not sign the agreement as drafted but had his own attorney prepare a draft dated September 17, 1956. This latter draft contained, among other things, changes eliminating all reference to net operating losses and to the contingency that all notes be also acquired at a certain price. It was ultimately signed by the parties named therein. The amount set forth as the purchase price of the stock of Arlington was $30,000. On the same day as the signing of the second draft of the stock purchase agreement, a separate letter agreement was signed by the same parties, providing that the stock purchase agreement is contingent *191 upon Silver's ability to acquire for Conant all of Arlington's notes, except that held by Minnesota, for a price not to exceed $89,559. The notes included in this arrangement were in the face amount of $245,532.85. At the time both of the foregoing agreements were executed, Arlington was insolvent, its capital stock was worthless except insofar as potential loss carryovers were "locked in" such stock, and its notes were uncollectible. These facts were known to Conant and his associates (hereinafter called the "Conant Group"). For its fiscal year ended September 30, 1956, Minnesota, which used the reserve method of accounting for bad debts, charged against such reserve the note of Arlington in the amount of $34,804.71 held by it. Conant was in control in Minnesota. This charge-off was made by Conant and his agents in the belief that any debts due from Arlington had by then become wholly worthless and uncollectible. In the audit of Minnesota's return for its fiscal year ended September 30, 1956, the examining agent determined that this charge-off was erroneous. In accordance with the arrangements between Silver and the Conant Group, Conant proposed to the creditors of Arlington (exclusive *192 of Minnesota) that they transfer their notes to him for 30 percent of the face amount. An escrow for this purpose in the amount of $89,559 was set up with the American National Bank of St. Paul (hereinafter called the Bank) providing that the various notes are to be endorsed either to Conant or in blank. This agreement also provided that none of the escrowed funds were to be disbursed until all creditors had acquiesced therein. Some creditors did not accept the offer of 30 percent of face amount and individual negotiations were commenced as to them. Ultimately, some arrangement was reached with each creditor, including several who received payment in full. The transaction with respect to the notes eventually required the expenditure of $12,547.36 in excess of the amount ($89,559) set forth in the letter agreement with Silver and placed in escrow with the Bank. Approximately one-half of this additional out-lay, or $6,250, was borne by Silver in the form of a reduction in the figure set forth as the purchase price of his stock, reducing said figure from $30,000 to $23,750. Upon completion of arrangements with all creditors, Conant and his attorney executed and sent to the Bank a document *193 dated November 8, 1956, and entitled "Certification" authorizing the bank to disburse the escrowed funds. This document had attached to it two lists marked "A" and "B." List "A" of said document contained in one column the names of those creditors who would not accept less than the full face amount of their respective notes, in a second column were the check numbers of the respective checks to be sent to each such creditor, and in the third and last column were the respective amounts payable to each. This last column was entitled "Notes Payable in Full." List "B" of said document contained various columns, including a collumn with the names of various creditors, a column showing the amount of each respective note, and a column showing the amount payable to each respective creditor. This latter column was entitled "Authorized Settlement." At the bottom of list "B" is the statement "World Tool & Engineering Co. note for $1,072.50 satisfied in full by deduction of $536.25 to be made by National Presto Industries, Inc." Thereupon the Bank sent checks to the various creditors in accordance with the foregoing "Certification" and lists attached thereto. Each check noted that it represented *194 payment "in full for the indebtedness of the Arlington Corporation, as represented by the note which you hold." The various notes affected were ultimately endorsed in blank and turned over to Conant or his agents. About November 8, 1956, the agreement, as amended, between Silver and the Conant Group with respect to Arlington's stock was executed. Silver received $23,750 and the Conant Group received all outstanding shares of Arlington. Thereafter, and on the dates shown, the stockholders of Arlington and their respective number of shares were as follows: Number of SharesStockholder1-1-571-1-5812-31-58Conant2162168,723Doris Conant1441445,493Farkas2020808Luke2020808Arnold Luke00161Robert Evans0016140040016,154 Arnold Luke and Robert Evans became stockholders on or above January 15, 1958. After said acquisition by the Conant Group and during 1956 through 1957, Illinois made advances to Arlington as follows: YearMonthAmount1956November$ 50,0001956December20,0001957February12,0001957May18,0001957June50,0001957July10,0001957August15,0001957November25,000Total$200,000On July 1, 1957, Arlington borrowed $150,000 from the Bank. This loan was guaranteed by Illinois and could not have been obtained *195 without such guarantee. Illinois received the proceeds of the loan and credited Arlington in the amount of $150,000. From and after March 1957 the books of Minnesota and Illinois show the following sales (all on open account) to Arlington: Books of MinnesotaDateAmount4- 4-57$ 815.954-30-573,137.755- 8-572,823.048-19-57312.9010-17-57806.781-10-582,741.311-10-581,263.591-13-581,730.82$13,632.14Books of Illinois3- 4-57$ 2,640.433-22-573,190.683-25-57483.603-28-57967.984- 4-572,843.484-16-573,437.554-19-57340.235- 9-57363.755-21-57276.425-24-57377.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.006-11-57856.326-20-57364.006-29-57531.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.368- 7-57177.338-13-57152.668-16-57(82.22)8-16-57333.3912-16-5753.2712-19-5770.8812-27-57176.801-20-58517.661-31-58456.742-10-58347.43* 3- 1-5813,632.143-10-581,332.72C/M(753.78)Balance3-31-58$33,194.89None of the payments due April 15, 1957, on Arlington's notes were made. All of such payments were, at some time after November 8, 1956, extended to April 15, 1958, by signature of Howard R. Conant as "holder." For some years prior to the change in its control effected in November 1956, *196 Arlington had been primarily engaged in the business of performing work for the United States Government of a military or related character. Upon acquisition of control by the Conant Group or some time prior thereto, Arlington ceased entirely to engaged in such business. Prior to acquisition of its control by the Conant Group, Arlington acquired a franchise to manufacture as a proprietary item the "Viking" trailer hitch. Prior to November 8, 1956, Arlington had a prototype of a trailer hitch which was not yet in production. Thereafter, and until it disposed of the aforesaid franchise in 1958, Arlington considered such manufacture as its principal business, and termed the trailer hitch as its "product line." Such manufacturing activity was the principal source from which Arlington hoped to realize profits. By August of 1956 Arlington was no longer being operated for the purpose of earning profits in the business in which it was then engaged, or even to continue in that business for any substantial further length of time. Existing conditions made such prospects impossible and Arlington was in the process of winding up its affairs. Sound economic considerations would have caused it to *197 have previously ceased operations, and its continued operation by the then existing management was solely for the purpose of permitting dissipation of remaining liquid assets for the benefit of such management and personnel. At or about the time the Conant Group acquired control, Arlington had virtually no working capital, and received an advance from Illinois in the amount of $50,000, purportedly as a loan. A letter by Conant to Arlington's management contains the following pertinent instructions: On the loan of $50,000 from Interstate Steel Company, please set this up on a 5% annual basis. If no interest were to be charged, it would look a little peculiar. * * * Said advance was quickly used up and Arlington soon was again virtually devoid of working capital. This shortage was so acute that Arlington could not afford to pledge its accounts receivable in order to obtain a loan in the amount of $15,000, not obtainable otherwise, because it required such receivables in order to finance current operations. At the time the Conant Group acquired control of Arlington, Arlington had no line or product of its own in production, i.e., as distinct from job shop work consisting of the performance *198 of specific work for and in accordance with the specifications of a specific customer. Such product or line is necessary to stabilize volume and in the case of Arlington was essential to a profitable operation. By mid-1957 Conant had determined to reduce Arlington's operations to a point where a profitable future was virtually impossible. The new management which Conant had placed with Arlington after the Conant Group had acquired control then resigned. The record does not disclose any further business activity on the part of Arlington or any interest taken therein by Conant after July 1, 1957. It had become apparent to Conant at least by that time that Arlington could not become profitable. Although Arlington's income tax return for the calendar year 1956 shows a small profit, actual operations resulted in a substantial loss. The income tax profit was possible only because a substantial amount was received by Arlington in 1956 as an additional award from the Government with respect to the contract to produce practice bombs for the Navy. At all times material herein Illinois has been many times larger than Arlington and is far more widespread in the size and territorial extent of its *199 business operations and transactions. The business and financial world tended to view the November 1956 transaction as the acquisition of Arlington by Illinois. On January 15, 1958, Arlington received the assets and liabilities of Illinois and Minnesota in exchange for the issuance of shares of its capital stock. Thereafter, Arlington changed its name to Interstate Steel Co., and Illinois and Minnesota were liquidated and dissolved. Arlington changed the location of its principal office and place of business to that previously utilized by Illinois at 2100 Greenwood Street, Evanston, Illinois. Immediately prior to the foregoing transaction Arlington was insolvent and its capital stock was virtually worthless. Its balance sheet as of December 31, 1957, showed a deficit in the amount of $493,529.76. Legal and related fees in excess of $7,000 were incurred in connection with the abovedescribed transaction of January 15, 1958. The respective interests of the members of the Conant Group in the notes of Arlington were in the same proportions as their respective interests in Arlington's stock. By letter dated March 18, 1958, Conant, on behalf of himself and other members of the Conant Group, *200 outlined a proposal to the American National Bank & Trust Company (hereinafter called the Trust Company) wherein the notes of Arlington (exclusive of that held by Minnesota which had been previously charged off as worthless) totaling in the face amount of $242,760.62, would be sold to the Trust Company at a normal discount rate. By letter dated April 11, 1958, Conant modified his proposal to cover notes in the face amount of only $228,236.59. The Trust Company accepted Conant's proposal and on or about April 11, 1958, it issued checks as follows: PayeeAmountConant$110,891.22Doris Conant72,183.95Luke10,615.29Farkas10,615.29Conant endorsed the notes to Arlington to the Trust Company. Arlington (now renamed Interstate Steel Co.) thereupon made payments to the bank in accordance with the schedules contained in the aforesaid notes, including the payment on or about April 15, 1958, of the amounts originally scheduled as payable on April 15, 1957, and extended by Conant to April 15, 1958. Throughout their respective corporate existences the balance sheets of Illinois showed total capital stock in the amount of $100,000, and those of Minnesota showed total capital stock in the amount of $1,000. *201 The balance sheets of Arlington originally showed total capital stock in the amount of $50,000, and, after the retirement of 100 shares on July 10, 1953, showed total capital stock in the amount of $40,000, to the end of its calendar year 1957. The balance sheet of Arlington (as Interstate Steel Co.) as of December 31, 1958, showed capital stock in the amount of $1,615,400, and a deficit in earned surplus and undivided profits in the amount of $201,046.63. Arlington did not carry over into its balance sheet after the foregoing transaction any part of the surplus and undivided profits of Illinois and Minnesota. On April 23, 1958, an agreement was executed providing for the sale at auction of all of Arlington's assets and business formerly used in its St. Paul operations. Said agreement referred to such operations as "a business known as Arlington Corporation, a division of Interstate Steel Company." On May 20, 1958, all remaining real and personal property thereof were offered for sale at auction. The sale was referred to as property of "Arlington Corporation," and the trailer hitch was prominently represented as the principal aspect of the business. In its corporate income tax return *202 for 1958 Arlington (now Interstate Steel Co.) claimed as a deduction carryover of net operating losses from the fiscal period February 1 to December 31, 1955, and from the calendar year 1957, in the total amount of $487,692.88. In the statutory notice of deficiency mailed to Arlington, respondent has disallowed the deduction so claimed. In their respective returns for 1958 the Conants and the Farkases treated the transaction with respect to the notes of Arlington as the sale of long-term capital assets and reported gain therefrom as follows: Cost BasisProceedsGainHoward F. and Doris Conant$92,766.57$191,075.17$98,308.60Lawrence and Regina Farkas5,153.7010,615.295,461.59Herbert and Cecille Luke did not disclose any facts with respect to this transaction in their 1958 return. In the respective statutory notices of deficiency mailed to each taxpayer, respondent has treated the entire amount received by each individual petitioner as ordinary income in the nature of a dividend. Opinion Issue I. Net Operating Loss Carryover Respondent, in his notice of deficiency in Docket No. 89322, disallowed net operating loss deductions in the amount of $487,692.88 claimed by Interstate Steel Co., the *203 corporate petitioner herein, to have been incurred during 1955 and 1957 by its predecessor, Arlington Corp., and deducted from corporate petitioner's gross income for the taxable year 1958. 3 Respondent has predicated his disallowance of the net operating loss carryover in controversy under section 269(a)(1) and (2) and (c)4*204 *205 and section 382(a)(1)(A) and (B) and (C)5*206 of the Code of 1954. Preliminarily, we note that petitioner in Docket No. 89322 contends that the disallowance of the net operating loss carryover deduction in dispute is not before the Court pursuant to section 269, supra. Essentially, it is petitioner's position that respondent may not for the first time in his opening statement rely upon section 269 since that section must have been specifically pleaded in the notice of deficiency to enable us to consider it as part of the instant proceeding. We believe that the notice of deficiency herein meets the requirements of the internal revenue law. Section 6211 of the 1954 Code defines a deficiency as simply the excess of the tax due over the amount shown as due on the return (plus any interim deficiencies collected). No particular form of notice is required by section 6211, supra. The determination of a deficiency is thus the determination of an amount, not a particular method of computation or theory. See Veeder v. Commissioner, 36 F. 2d 342-343 (C.A. 7, 1929), affirming a Memorandum Opinion of this Court. We note *207 that while petitioners' counsel, in his opening statement, maintained that section 269 was not before the Court, he discussed the issues involved herein with particular reference to section 269, supra. Manifestly, counsel for petitioners at the outset of the trial was already familiar with the theory of respondent's determination, and understood that the deficiencies were predicated in part on section 269, supra. Moreover, petitioners filed no motion for continuance or extension of time for further preparation of their case to protect themselves against any uncertainty. Rule 20, 6Tax Court of the United States. See Haag v. Commissioner, 59 F. 2d 516, 518 (C.A. 7, 1932), affirming 19 B.T.A. 982 (1930). We also observe that respondent in his opening statement asserted that petitioners *208 had been aware for some length of time that section 269 was one of the reasons the Government was denying the carryovers and claiming the proceeds to constitute a taxable dividend. This averment was not questioned by petitioners. We believe that the broad and inclusive language of the statutory notice involved herein adequately embraces the concept of a disallowance of the loss carryover in dispute under section 269, supra. Moreover, it is settled that we may affirm respondent's determination for reasons other than those which he has assigned in his notice of deficiency. As stated in Millar Brainard, 7 T.C. 1180, 1184 (1946): This ground, it is true, is not the one specified in respondent's statement attached to the deficiency notice. It is our function, however, to redetermine a deficiency and not respondent's reasons for it. Edgar M. Carnrick, 21 B.T.A. 12; Raoul H. Fleischmann, 40 B.T.A. 672. See Dorothy Whitney Elmhirst, 41 B.T.A. 348. Once the amount of the deficiency is found to be correct, there could be only one reason for failing to give it effect, regardless of the grounds for it propounded by respondent, and that would be that the petitioner was misled in the presentation *209 of his case. * * * Respondent's determination is presumptively correct and petitioner cannot meet its burden to show error therein merely by showing that respondent has assigned a different or additional reason for his determination or has made his reason more explicit. In Standard Oil Co., 43 B.T.A. 973 (1941), affd. 129 F. 2d 363 (C.A. 7, 1942), certiorari denied 317 U.S. 688 (1942), rehearing denied 319 U.S. 784 (1943), we said at pages 998-999: At the outset petitioner contends that, since the respondent has changed his reasons as to why the amount of $2,901,865.46 should not be allowed as a deduction from gross income, the burden is upon the respondent to both plead and prove the facts necessary to support the disallowance upon the new ground. * * * The issue here is Stanolind's right to the deduction sought. Upon that issue petitioner has the burden of pleading and proof. Burnet v. Houston, 283 U.S. 223; Welch v. Helvering, 290 U.S. 111. The respondent correctly argues in his brief that "Deductions may be disallowed by the Commissioner without assigning any reason or theory for his action and if he assigns a reason or advances a theory in his deficiency notice, though *210 it be erroneous, he is not restricted thereto in his defense of an appeal to the Board asserting such disallowance as error." Cf. Edgar M. Carnrick, 21 B.T.A. 12, 21; Crowell v. Commissioner, 62 Fed. (2d) 51, 53; James P. Gossett, 22 B.T.A. 1279, 1284; affd. 59 Fed. (2d) 365; rehearing denied, 60 Fed. (2d) 484; John I. Chipley, 25 B.T.A. 1103, 1106; Charles J. O'Laughlin, 30 B.T.A. 1327, affd. 81 Fed. (2d) 269; Alexander Sprunt & Son, Inc. v. Commissioner, 64 Fed. (2d) 424, 427; Raoul H. Fleischmann, 40 B.T.A. 672. Petitioner was not taken by surprise. In his opening statement to the Board, counsel for respondent said that, on the question of the deductibility of the payment by Stanolind, the respondent had two positions, namely, (1) that as a matter of public policy the deduction was not permissible, and (2) that in any event the amount of $2,901,865.46 should be excluded from Stanolind's net loss for the period immediately preceding affiliation because it was not of such a character as may be carried forward as a net loss under section 117(a)(1) of the Revenue Act of 1928. All of the facts upon which the respondent relies are in the record. Consideration of those facts *211 is not precluded by reason of the absence of a special pleading on the part of the respondent. If, upon the consideration of all the evidence, petitioner has failed to establish Stanolind's right to the claimed deduction, the respondent's disallowance thereof must stand, even if it be for a reason other than that given in the deficiency notice. * * * In support of its position that the notice of deficiency was deceptive and did not give proper notice that respondent was proceeding under section 269, supra, petitioner relies, inter alia, on Commissioner v. Chelsea Products, Inc., 197 F. 2d 620 (C.A. 3, 1952), affirming, 16 T.C. 840 (1951) and The T.V.D. Co., 27 T.C. 879 (1957). We have carefully considered these cases but we do not find them controlling here in view of the apparent awareness on the part of petitioner, prior to the beginning of the trial, of the fact that respondent was relying, inter alia, on section 269. Upon the facts before us, it is our view that petitioner has not been prejudiced or harmed in any manner. Hay v. Commissioner, 145 F. 2d 1001, 1107 (C.A. 4, 1944), affirming 2 T.C. 460 (1943), certiorari denied 324 U.S. 863 (1944); A. Finkenberg's Sons, Inc., 17 T.C. 973, 980-981 (1951), *212 and cases cited therein. Apart from the procedural question resolved hereinabove in respondent's favor, petitioners maintain that the loss carryovers in dispute in the aggregate amount of $487,692.88 are deductible under section 172(a)7 of the 1954 Code and that section 269, supra, is inapplicable. Fundamentally, the core of the issue herein is whether the "principal purpose" of the acquisition of control of Arlington Corp. in 1957 was for bona fide business reasons, as urged by petitioners, or as contended by respondent, to evade or avoid Federal income tax by securing the benefit of a deduction, credit, or other allowance which the acquirers could not otherwise enjoy as proscribed in section 269, supra. No question is raised as to acquisition or control. Respondent's determination is prima *213 facie correct, and it is petitioners' burden to prove that such determination was erroneous. American Pipe & Steel Corp., 25 T.C. 351, 366 (1955), affd. 243 F. 2d 125 (C.A. 9, 1959), certiorari denied 355 U.S. 906 (1957). Temple Square Mfg. Co., 36 T.C. 88, 92 (1951). Upon the record as a whole, therefore, the narrow question emerges as to whether petitioners have carried their burden of demonstrating that a tax avoidance purpose did not outrank or exceed in importance any other purpose. J. T. Slocomb Co., 38 T.C. 752, 765 (1962) (On appeal C.A. 2, Mar. 13, 1963); Hawaiian Trust Company Limited v. United States, 291 F. 2d 761, 765 (C.A. 9, 1961); Commodores Point Terminal Corporation, 11 T.C. 411, 416 (1948). Section 1.269-3(a), Income Tax Regs.At the outset we are mindful that the fact that tax benefits are considered in planning an acquisition is not conclusive proof that the "principal purpose" was tax avoidance. Baton Rouge Supply Co., 36 T.C. 1, 13 (1961); Berland's Inc. of South Bend, 16 T.C. 182, 188 (1951). However, while taxpayers may, if otherwise allowable by law, mold their business transactions so as to minimize their taxes, Gregory v. Helvering, 293 U.S. 465 (1935), *214 the Supreme Court in Commissioner v. Court Holding Co., 324 U.S. 331 (1945), stated (p. 334): The incidence of taxation depends upon the substance of a transaction. * * * To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress. * * *As also stated by the Supreme Court in Gregory v. Helvering, supra, "To hold otherwise would be to exalt artifice above reality, and to deprive the statutory provisions in question of all serious purpose." In essence, petitioners contend that the Conant Group's principal purpose in acquiring Arlington's stock and outstanding notes was to acquire a business (related to their own steel distributing business) which could be made very profiable; and that the acquisition was made by means of purchase of the Arlington stock and outstanding notes (rather than its assets) because of the seller's wishes to keep the company "alive," the advice of the buyer's attorney to forestall any delay resulting from suits by Arlington creditors, and the desire of the buyer not to be accused of having acquired the corporation *215 at the expense of the creditors. These contentions, of course, are factors to be considered, but they nevertheless leave us free to inquire beyond the reasons advanced to determine if they have substance and if they outrank in importance a tax avoidance purpose. While the record supports the existence of petitioners' business purpose, it is also evident that the record supports the existence of a tax-avoidance purpose. Manifestly, in cases of this character, it is hardly to be expected that there will be any direct evidence of intent to come within the statutory prohibition. The motives of the acquirers can more readily be ascertained by a thorough evaluation of the entire record and the inferences to be drawn therefrom. S. Rept. No. 627, 78th Cong., 1st sess., p. 59. Sec. 1.269-3(a), Income Tax Regs. As we stated in Army Times Sales Co., 35 T.C. 688, 704 (1961): The judicial ascertainment of someone's subjective interest or purpose motivating actions on his part is frequently difficult. One method by which such ascertainment may be made is to consider what the immediate, proximate, and reasonably to be anticipated consequences of such actions are and to reason that the person who *216 takes such actions intends to accomplish their consequences. This reasoning is implicit in the Latin maxim "acta exteriora indicant interiora secreta", and in the more homely English adage "actions speak louder than words." * * *Whether the acquisition of control of a corporation is for the interdicted purpose mentioned in section 269(a) presents a question which is primarily factual. Elko Realty Co. v. Commissioner, 260 F. 2d 949 (C.A. 3, 1958), affirming per curiam our Opinion at 29 T.C. 1012 (1958). In essence, the record shows that Arlington, during its fiscal period February 1 to December 31, 1955, suffered a substantial net operating loss of $628,296.70 in its business in St. Paul, Minnesota, resulting largely from the production of military items for the United States Government. During the calendar year 1956 Arlington had a net profit of $2,085.84 which apparently was due to a special supplemental award from the Government. In the calendar year 1957 Arlington again had a loss of $96,746.05. Cortland Silver, owner of all of Arlington's stock, was interested in selling Arlington because he didn't want to be connected with a bankruptcy. During this period Howard Conant was *217 the principal shareholder and dominant personality in both Illinois and Minnesota. Conant and his wife owned 90 percent of the stock of Illinois and Conant owned 87 1/2 percent of the stock of Minnesota. Illinois, with its principal office in Evanston, Illinois, and several times larger than Arlington, was reaping large operating profits in the business of importing, distributing and warehousing steel. For the period November 1, 1957, to January 15, 1958, Illinois had surplus and undivided profits of $1,402,215.26. Although Illinois generally enjoyed substantial earnings it paid no dividends to stockholders at any time from its fiscal year beginning November 1, 1950, until it terminated its existence in 1958. Illinois's stockholders also owned the stock of Minnesota, which operated a sales office and bought steel in St. Paul, and which also consistently enjoyed substantial profits. At no time during Minnesota's corporate existence was a dividend paid to its stockholders. During 1955 Arlington was little more than a corporate shell. It was virtually insolvent, under the control of its creditors, and was unable to continue in business. During that year the stockholders of Illinois and *218 Minnesota purchased all of Arlington's stock and outstanding notes of indebtedness in the approximate face amount of $240,000 from outside creditors for a total cash outlay of $125,856.36, of which $102,106.36 was for the notes and $23,750 was for the stock. The latter amount was paid directly to Silver, the sole stockholder. After about 14 months, during which time Arlington unsuccessfully manufactured trailer hitches and other items and performed certain job shop civilian work, Arlington's corporate shell was transferred to the business situs of Illinois. Thereupon, Arlington acquired the assets of Illinois and Minnesota in exchange for shares of its own stock, amended its charter to cover the activities of Illinois and Minnesota, changed its name to Interstate Steel Co., its principal office and place of business to that of Illinois, and thereafter carried on only the business theretofore carried on by Illinois and Minnesota. Arlington did not seek to carry on any activity in which it had ever previously engaged, and shortly thereafter offered all of its old assets for sale at auction under its old name. Arlington now seeks to carry over and deduct the losses in its military business *219 and in its manufacture and job shop business in the aggregate amount of $487,692.88 against earnings resulting from the operation of the steel business formerly carried on by Illinois and Minnesota. In 1958, the Conant Group sold their notes payable by Arlington to a bank. The Conants and Farkases treated the proceeds as long-term capital gains. Herbert and Cecille Luke did not disclose any facts with respect to this transaction in their 1958 return. The principal purpose apparent in this record for casting the transaction in this form was to receive the benefits of Arlington's sizable losses which otherwise would not be enjoyed by its shareholders. We do not regard as significant the particular sequence in which the several steps or manipulations took place. The language of the statute is broad. It reaches any acquisition of a loss corporation directly or indirectly where the principal purpose is evasion or avoidance of Federal income tax. Moreover, the acquisition of the assets of Minnesota and Illinois by Arlington in 1958 after 14 months of operation (after the acquisition and control of Arlington by the Conant Group) does not make the acquisition too remote for the application *220 of section 269, supra. Analysis of the entire record, and in particular the cross-examination of Conant and Mandel, lead us to conclude that the principal purpose for acquiring Arlington was the evasion or avoidance of income taxes by securing the benefit of a loss deduction. In our view if the Conant group had sought to acquire Arlington primarily for business and nontax economic purposes, as petitioners urge, they would have followed a more realistic course of conduct than to purchase its capital stock and outstanding notes which were at best of questionable value. By September 1956 Arlington was a moribund corporation which had operating loss experience for several (though not consecutive) years immediately prior to the sale of its stock. Arlington was practically devoid of working capital and could not obtain financing; its attempts to interest persons to acquire it as a going business had failed and Silver's stock was in part (49 percent) subject to a pledge of the Creditor's Committee, which represented a majority of Arlington's creditors. Significantly, at the time Arlington's stock was purchased by the Conant Group and prior to its merger, it had available a net operating *221 loss carryover in the neighborhood of $390,000, which represented a potential tax saving. If available for tax purposes, there would be a substantial and valuable benefit in view of the financial success of Minnesota and Illinois. Moreover, the expected future profits from the conduct of that part of the business which had been operated by Arlington prior to the merger were at least problematical. Under the circumstances, a tax avoidance purpose is clearly to be inferred. We have carefully considered the testimony of petitioners' witnesses, including that of Conant, offered in substantiation of the claimed primary importance of the business purpose underlying the transaction in question. In our opinion Conant's testimony is entitled to little weight. That we are not obliged to accept the uncontradicted testimony of a witness when his testimony is inherently improbable or inconsistent with other material evidence is well settled. F. C. Publication Liquidating Corporation v. Commissioner, 304 F. 2d 779 (C.A. 2, 1962), affirming 36 T.C. 836 (1961). Although Conant testified that his principal purpose was not to obtain control of Arlington for its net operating loss but to obtain a *222 business enterprise with a great potential of profit ("a real winner"), his actions with respect to the acquisition of its stock, and the sequence of events in connection with the entire transaction, compel a different conclusion. In several critical respects Conant's testimony was inconsistent with other affirmative evidence of record. Conant testified that Arlington had been making trailer hitches prior to the acquisition of control by his group, and that after such acquisition Arlington's business was "exactly the same as before." These material statements are contradicted by the testimony of Tieso, an officer of Arlington, showing that no production of trailer hitches had taken place prior to the acquisition of control; by the creditors' correspondence showing that by September 1956 Arlington had no line or product of its own; and by Arlington's 1958 return showing that the trailer hitch franchise was not acquired until 1956 or 1957. It does not seem plausible that Conant, an alert and intelligent businessman, with extensive experience in the steel industry, made the acquisition in question principally as a business venture and for the principal purpose of pumping new financial *223 life into the then insolvent corporation faced with bankruptcy. Manifestly, the Conant Group was eager to take advantage of an opportunity to acquire potential tax benefits aggregating amounts several times greater than their initial investment of $125,000, of which $23,750 was paid for all of Arlington's stock. In view of our discussion, supra, and the conclusions reached, we think it would serve no useful purpose to give consideration to the applicability vel non of section 269(c) relating to presumptions in case of disproportionate purchases. See Fawn Fashions, Inc., 41 T.C. 205, 210 (1963). We find no merit in petitioners' contention, on brief, that respondent abused his discretion under section 269(b)(1), I.R.C. 1954, in not allowing the portion of the loss carryover ($96,745.05) attributable to the operation of Arlington after the acquisition of control. Section 269(a) applies to post-acquisition losses as well as pre-acquisition losses as long as the principal purpose of the acquisition was the evasion or avoidance of tax by securing the benefit of those losses. Section 1.269-3(b)(1), Income Tax Regs. In Temple Square Mfg. Co., 36 T.C. 88, 95 (1951), we rejected the taxpayer's *224 attempt to fragmentize losses incurred in the acquisition of a loss corporation, stating: "Once the principal purpose of the acquisition is found, namely to evade or avoid tax, any deduction which would not otherwise be available, is rendered unallowable." Naeter Brothers Publishing Company, 42 T.C. 1 (1964); R. P. Collins & Co., Inc. v. United States, 303 F. 2d 142, 145-146 (C.A. 1, 1962); Zanesville Investment Co., 38 T.C. 406, 415 (1962). In reaching our conclusion we are mindful that after the acquisition of Arlington by the Conant Group, Illinois made advances to Arlington during 1956 and 1957 in the amount of $200,000. There is no affirmative evidence before us as to the specific use made of such funds; or the amount thereof which was recouped in the form of machinery or other assets upon the auction of Arlington's assets in 1958. It is our view that at the time of acquisition the Conant Group expected the Arlington operation to continue to sustain losses until at least the close of fiscal year 1958, and contemplated the investment or loan of additional working capital. Under the circumstances, we hold that the principal purpose of the acquisition was to secure the benefit *225 of these subsequent losses ($96,745.05) as well as the net operating loss carryover (about $390,000) in existence at the time of acquisition. Issue II. Sale of Arlington's Notes in 1958 Respondent determined that the amounts received by the individual petitioners (Docket Nos. 88890, 88891 and 88892) from the American National Bank and Trust Company during 1958 in connection with the sale to said bank of notes payable by Arlington Corp. constitute a distribution of earnings and profits from Interstate Steel Co. in the nature of a dividend and taxable as ordinary income under sections 61, 301 and 316 of the 1954 Code, rather than long-term capital gain on the sale of capital assets as urged by petitioners. Respondent also contends that the acquisition of said notes in 1956 was an integral part of the acquisition of control of Arlington by the Conant Group for the interdicted purpose mentioned in section 269, supra. Petitioners, in opposition, urge that the Arlington notes in question were purchased from the holders thereof in 1956 in arm's-length transactions, and that Arlington made no payment of cash or property to its stockholders or to said bank in 1958. Without repeating all of *226 the underlying facts which resulted in the aforesaid notes becoming assets of the Conant Group and continuing liabilities of Arlington, we think it is obvious that the notes in dispute, obligations of a deficit corporation, had no significant value other than their potential use for tax avoidance by the acquirers of Arlington. It is clear that neither the sale of the notes to the Trust Company, nor the payments of any of the amounts due thereon, would have been possible except for the merger transaction of January 15, 1958, whereby the assets of Illinois and Minnesota were made subject to payment thereof. In April 1958, Conant, on behalf of the Conant Group, endorsed the notes of Arlington to the Trust Company in the face amount of $228,236.59, which he had acquired in 1956 for about 30 cents on the dollar at the time he also acquired all of Arlington's stock. Assuming that Silver, the owner of all of Arlington's stock, insisted on a stock sale, we find it difficult to accept the procedure followed by the Conant Group with respect to the notes held by Arlington's creditors. The language of the various documents dealing with the notes in the transaction of 1956 is more indicative of *227 creditors being paid off as part of an equity investment in a corporation by stockholders than of a purchase. Cf. The Kelley Co. v. Commissioner, 326 U.S. 521 (1946); Charter Wire, Inc. v. United States, 309 F. 2d 878 (C.A. 7, 1962); Gilbert v. Commissioner, 262 F. 2d 512 (C.A. 2, 1959), certiorari denied 359 U.S. 1002 (1959). Thus, the check sent to each creditor does not reflect the price of its respective note, but mentions payment "in full for the indebtedness of Arlington Corporation." Also, we note that Conant testified with respect to the note transaction under review in terms of a "settlement" rather than a buy-sell transaction. In our opinion the amounts paid out to the noteholders by the Conant Group were referrable to the latter's stockholding, that is, equity investment. In substance, the Conant Group paid approximately $125,000 to pay off the Arlington creditors and to acquire 100 percent equity control of Arlington, a virtually defunct and worthless entity. Keeping the notes physically intact, in our view, served no purpose other than as part of the tax avoidance scheme without which the entire course of conduct here would be incomprehensible. Indeed, petitioners *228 themselves recognized the fact that not only the stock of Arlington but its notes as well were worthless. Thus, for its taxable year ended September 30, 1956, (within two weeks of the acquisition agreements) Minnesota which was Arlington's largest single creditor charged off its note in the amount of $34,804.71 as wholly worthless. It is noteworthy in this connection that the respective interests of the members of the Conant Group in the notes of Arlington were in the same proportions as their respective interests in Arlington's stock. Also, we note that Illinois and Minnesota had a surplus of about $1,351,648.13 and $54,834.06, respectively, immediately prior to the acquisition of Arlington in 1956. Illinois did not declare any dividend prior to 1950 and Minnesota never paid out any dividends. Considering the over-all transaction, and particularly the fact that in 1956 Arlington was on the brink of bankruptcy and under the control of a creditor's committee, we do not believe the Conant Group would have acquired the notes in question unless there was a strong probability that said notes could be used by them (as controlling stockholders of the merged corporations) at a subsequent date *229 to secure a tax advantage which they could not otherwise enjoy. It is our view that the acquisition of the aforesaid notes in 1956 was part and parcel of the entire merger transaction, and a tax avoidance potential to the noteholders was apparent through the benefit of allowance of capital gain treatment on the future sale of the notes at a discount to a bank. See Brown Dynalube Co., Inc. v. Commissioner, 297 F. 2d 915 (C.A. 4, 1962), affirming a Memorandum Opinion of this Court; J. T. Slocomb Co., 38 T.C. 752, 765 (1962) (On appeal C.A. 2, March 13, 1963). In Army Times Sales Co. 35 T.C. 688, (1961), the note of the insolvent debtor corporation, acquired by the individual taxpayer, was converted into debenture bonds and "redeemed" after the debtor had been "vitalized" by the injection of a profitable business enterprise. Rejecting the individual taxpayer's claim for capital gain treatment of income derived from redemption of the corporation's debenture bonds, we said (p. 705): We further conclude that, as part and parcel of such acquisition of control, Ryder's acquisition of the note and the conversion thereof into debenture bonds were for the principal purpose of avoiding Federal *230 income tax by securing to himself individually the benefit of the allowance of capital gains treatment of the corporation's payments or distributions in redemption of such debenture bonds. * * *Although the pattern of the transaction in the instant case involved the sale of the notes to a bank at a discount, we believe that the principle in Army Times Sales Co., supra, is equally applicable. Our conclusion after careful consideration of the over-all transaction, is that the amounts paid out by the Conant Group in 1956 to acquire Arlington's notes were in reality an equity investment. Viewing the substance of the transaction in its entirety, the net effect of the circuitous method employed herein shows that the primary purpose of the Conant Group in acquiring the notes in dispute was not for the purpose of improving Arlington's credit standing, as petitioners urge, but was an integral part of a plan to secure a tax benefit prohibited under section 269, supra. Manifestly, the acquisition of the notes in 1956 falls into the same category as the net operating losses in serving as the basis for securing the benefit of a deduction which the acquiring stockholders would not otherwise enjoy *231 but for such acquisition. Hence, we find and so hold, on the considerations discussed above and on the entire record, that the purported sale of the notes in question was in reality a distribution of earnings and profits in the nature of a taxable dividend to the stockholders taxable as ordinary income within the purview of section 316(a)(2) of the 1954 Code. See Army Times Sales Co., supra, p. 704. Cf. Estate of Henry A. Rosenberg, 36 T.C. 716, 724 (1961). In support of their position that they are entitled to long-term capital gain on the sale of their notes, petitioners rely on Driscoll, Jr. v. Commissioner, 306 F. 2d 35 (C.A. 7, 1962), reversing 37 T.C. 52, (1961). We have carefully considered this case and do not find it controlling. In Driscoll, supra, the narrow issue was whether amounts received by the taxpayer in retirement of notes qualify for treatment as amounts received in exchange for said notes under section 1232(a)(1) of the Code of 1954. Holding that section 1232(a)(1), supra, was not available to the taxpayers, the Tax Court construed said section as not granting capital gain treatment to retirement payments of corporate obligations existing before January 1, *232 1955, that were initially evidenced by unregistered and noncoupon evidences of indebtedness and not in coupon form by March 1, 1954. On appeal, it was held that the taxpayers were entitled to capital gain treatment on retirement of corporate obligations even though such obligations were originally issued in noncoupon, nonregistered form and was not in such form by March 1, 1954. In Driscoll, supra, neither the Court of Appeals nor this Court considered the issue here presented, i.e., whether the corporate notes were acquired by the taxpayers from outside creditors as part of a plan to evade or avoid Federal income tax as prohibited under section 269, supra; or that the notes in question represented equity investment by the acquirers. W add for completeness that petitioners' contention that respondent may not disallow the long-term capital gain claimed by them on the sale of the aforesaid notes under section 269, supra, because respondent did not specifically plead this section in his notice of deficiency is rejected for the same reasons discussed hereinabove in Issue I. In the light of the foregoing, we have concluded that petitioners have failed to establish by a preponderance of *233 the evidence that tax avoidance was not the principal purpose of the acquisition and control of Arlington. Accordingly, we must sustain respondent's disallowance of the net loss carryovers in issue and his treatment of the proceeds realized from the sale of the notes as ordinary income. In view of the above conclusions, there is no occasion to discuss the contentions raised by respondent with respect to section 382 of the 1954 Code. Decisions will be entered under Rule 50. Footnotes1. The following cases are consolidated herewith: Howard R. Conant and Doris Conant, Docket No. 88891, Estate of Lawrence Farkas, Deceased, et al., Docket No. 88892 and Interstate Steel Co., Docket No. 89322.↩2. A related case, Interstate Steel Co., Transferee of Interstate Steel Company of Minnesota, Transferor, Docket No. 89323, has been disposed of by stipulation of the parties and decision has been entered by the Court in accordance therewith.a. The net profit during 1956 was due to a special supplemental award on a contract for the production of practice bombs which it had with the Department of the Navy. After Arlington was sold in this year it sustained losses until the year-end.↩*. Balance on Minnesota's books transferred to books of Illinois. None of the above amounts were paid.↩3. In his statutory notice of deficiency, respondent determined that "The net operating loss deduction claimed on your return in the amount of $487,692.88 is disallowed because you have not established that any portion of such loss is allowable." ↩4. SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX. (a) In General. - If - (1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, or (2) any corporation acquires, or acquired on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation, and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then the Secretary or his delegate may disallow such deduction, credit, or other allowance. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation. * * *(c) Presumption in Case of Disproportionate Purchase Price. - The fact that the consideration paid upon an acquisition by any person or corporation described in subsection (a) is substantially disproportionate to the aggregate - (1) of the adjusted basis of the property of the corporation * * *; and (2) of the tax benefits (to the extent not reflected in the adjusted basis of the property) not available to such person or corporation otherwise than as a result of such acquisition, shall be prima facie evidence of the principal purpose of evasion or avoidance of Federal income tax. * * * 5. SEC. 382. SPECIAL LIMITATIONS ON NET OPERATING LOSS CARRYOVERS. (a) Purchase of a Corporation and Change in Its Trade or Business. - (1) In general. - If, at the end of a taxable year of a corporation - (A) any one or more of those persons described in paragraph (2) own a percentage of the total fair market value of the outstanding stock of such corporation which is at least 50 percentage points more than such person or persons owned at - (i) the beginning of such taxable year, or (ii) the beginning of the prior taxable year, (B) the increase in percentage points at the end of such taxable year is attributable to - (i) a purchase by such person or persons of such stock, the stock of another corporation owning stock in such corporation, or an interest in a partnership or trust owning stock in such corporation, or * * *(C) such corporation has not continued to carry on a trade or business substantially the same as that conducted before any change in the percentage ownership of the fair market value of such stock, the net operating loss carryovers, if any, from prior taxable years of such corporation to such taxable year and subsequent taxable years shall not be included in the net operating loss deduction for such taxable year and subsequent taxable years. * * *↩6. RULE 20. EXTENSIONS OF TIME. (a) An extension of time (except for the absolute time limit on filing of the petition, see section 6213(a)↩, Code of 1954, and except as otherwise provided in these Rules) may be granted by the Court within its discretion upon a timely motion filed in accordance with these Rules setting forth good and sufficient cause therefor or may be ordered by the Court upon its own motion.7. SEC. 172. NET OPERATING LOSS DEDUCTION. (a) Deduction Allowed. - There shall be allowed as a deduction for the taxable year an amount equal to the aggregate of (1) the net operating loss carryovers to such year, plus (2) the net operating loss carrybacks to such year. For purposes of this subtitle, the term "net operating loss deduction" means the deduction allowed by this subsection. * * *↩